In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 04-2344

ARQILE GJERAZI, KLARITA GJERAZI,
ALBA GJERAZI, and JUSTIN GJERAZI,

*Petitioners*,

*v.*

ALBERTO GONZALES,[1]

*Respondent.*

---

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A77-835-484

---

ARGUED APRIL 14, 2005—DECIDED JANUARY 30, 2006

---

Before COFFEY, RIPPLE, and KANNE, *Circuit Judges*.

COFFEY, *Circuit Judge*. Arqile Gjerazi ("Gjerazi"), his wife, Klarita, and their two children, Alba and Justin, are citizens of Albania. In March of 1999, the Gjerazi family fled Albania for the United States. The following November, Gjerazi filed an application for asylum on behalf of himself and his family with the Immigration and Naturalization

---

[1] Pursuant to Federal Rule of Appellate Procedure 43(c), we have substituted the current Attorney General of the United States, Alberto Gonzales, as the named respondent.

Service ("INS"),[2] seeking political asylum, withholding of removal, protection under the Convention Against Torture, and, in the alternative, voluntary departure.[3] The claims of Gjerazi's wife and children are derivative of Gjerazi's, and thus we focus on his petition and claims. Although the Immigration Judge ("IJ") found Gjerazi's testimony to be credible, he determined that Gjerazi had failed to establish that his persecution was politically motivated. The IJ denied Gjerazi's application for asylum as well as his request for voluntary departure and ordered the Gjerazi family to return to Albania. The Board of Immigration Appeals ("BIA") adopted and affirmed the IJ's decision in a one-paragraph opinion. We grant the Gjerazi family's petition for review and remand this case for further proceedings, holding that the IJ and BIA's conclusions are not supported in the record with substantial evidence.

## I. Background

### A. The Gjerazi Family's Life in Albania

Gjerazi, his wife, and their two children are natives of Albania. Gjerazi testified that he had been an active member of the Democratic Party, the largest opposition party to the Socialist Party in Albania, since 1992. In November of 1993, Gjerazi was elected to the position of

---

[2] On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice, and its functions were transferred to the newly formed Department of Homeland Security.

[3] Petitioners do not challenge the denial of their request for protection under the Convention Against Torture. Thus, they have abandoned that claim in this review petition. *See Balogun v. Ashcroft*, 374 F.3d 492, 498 n.7 (7th Cir. 2004) (noting that claims not addressed in opening briefs are abandoned).

"secretary" for the Democratic Party in the Albanian city of Fier, a position he held until July of 1997. He testified that his duties included contacting Albanians to promote the ideology of the Democratic Party as well as maintaining quotas and collecting membership dues for the Fier region. He also assisted in preparations for the 1997 elections, including sponsoring and organizing Democratic Party meetings, and was selected to represent the party at a polling station in Fier.

Not only was Gjerazi an active member of the Democratic Party, but previous generations of his family had similarly taken active roles in opposing the Socialist Party. In his application for asylum, he stated that his political activism as well as that of past generations of his family resulted in frequent persecution by Albanian authorities. For example, during his asylum hearing, he testified that his uncle and his mother's uncle had been imprisoned by the Communist Party for twenty-four and eighteen years, respectively. As a result of his family's history of political activism, when he was a child, the Socialist government confiscated land and a store that had been in his family for years. In 1990, the property was returned to Gjerazi's mother, and, upon her death in 1992, Gjerazi became the owner. Despite these past problems, Gjerazi testified that once the property was returned to his family, he made a "good living" as a store owner. He drew approximately $3,000 in profit each month and was considered "quite wealthy" by Albanian standards.

Despite his status in Albania as a successful business owner, like past generations of his family, Gjerazi's political activism precipitated several unfortunate events. On June 5, 1997, while en route to a party meeting in Tirana, Albania's capital city, the taxi transporting Gjerazi was stopped by two masked men who forced him out of the vehicle and assaulted him, beating him with the butt of a gun and kicking him until he lost consciousness. Gjerazi testified that as they beat him, the men stated that he

would not be going "to meet the celebration in Tirana." He did not continue on to Tirana or seek medical attention. Upon returning to his home that evening, he received an anonymous telephone call during which the caller threatened him with "very bad consequences" if he did not adjust the election returns in order to ensure the success of the Socialist Party. Gjerazi testified that because he was the person responsible for the polling station in Fier, he "figured that [the callers] wanted [him] to manipulate the results and the scores" in order that the Socialist Party would prevail. Although he reported the incident to Democratic Party officials as well as to the police, no action was taken to locate the assailants or to determine who made the call and the ensuing threat.

Three days after he was attacked on the way to Tirana, a second major incident befell the Gjerazi family. On June 8, 1997, Gjerazi's two-year-old son, Justin, was kidnaped while playing in his own backyard. Gjerazi claimed that two officials from the Socialist Party, Argon Mecallin and Agim Idrizi, were responsible for the kidnaping. He testified that, approximately one half hour after the child's abduction, the kidnapers contacted his father-in-law and conditioned the child's release on the Socialist Party winning the vote in Fier. According to Gjerazi, his father-in-law told the kidnapers that Gjerazi was not the "main decision-maker" at the polling station and that he could not guarantee the results they wanted. Gjerazi immediately contacted the police, controlled at that time by the Democratic Party. While the police were sympathetic, they were unable to secure his son's release, so Gjerazi enlisted the aid of his wife's uncle.[4] The uncle located the child and was able to negotiate the boy's release in exchange for a ransom of

---

[4] Gjerazi described his wife's uncle as "a very popular person" in Fier.

$5,000. A few weeks after Justin's kidnaping, the Socialist Party won the election, including the local election in Fier.

On July 2, 1997, approximately one month after his son's abduction and a few days after the Socialist Party regained control of Albania, Gjerazi's wife, Klarita, was accosted and beaten by two masked men. Klarita testified that when she arrived home, the men struck her from behind, entered the home, and began calling out for Gjerazi. When they discovered he was not in the apartment, they beat her into a state of unconsciousness. After the attack, Klarita spent ten days confined in a hospital. Shortly after her release from the hospital, Gjerazi resigned from his position as a secretary of the Democratic Party and moved his family to Vos Kopoje, a town located in a remote mountainous area in Southern Albania. Although Gjerazi continued to live in Fier, he traveled to Vos Kopeje regularly, keeping a "low profile" while deciding what to do with his family's store, land, and personal belongings.

Gjerazi's problems flared up again in April of 1998, when he attended a monthly Democratic Party meeting. After returning from the meeting, Gjerazi's apartment was set on fire while he was in the building. Although he escaped, his unit was completely destroyed. After the fire, Gjerazi moved to Vos Kopoje with his family. In September of 1998, he returned to Fier to attend a peaceful demonstration in protest of the assassination of Azem Hajdari, a Democratic Party official. Shortly after the demonstration, a warrant was issued for Gjerazi's arrest, alleging that he had attacked the main offices of the police station. Although he received notice of the arrest summons, instead of reporting to the police, he began making arrangements to leave Albania.

Upon payment of $15,000, Gjerazi arranged for Slovenian passports and transportation, and, on March 23, 1999, he

and his family fled Albania. After a stop in Italy,[5] they flew to the United States. Gjerazi testified that when he and his family arrived in the United States, he destroyed their Slovenian passports as directed by the individuals who provided the passports. In November, the Gjerazis filed for asylum.

According to Gjerazi, when he left Albania, he did not know that he would eventually land in the United States and apply for asylum. During the hearing, he explained that he feared returning to Albania with his family because the Socialist Party was still in power. He testified that his family's persecution in Albania was motivated by his membership in the Democratic Party and that he believed current conditions in Albania to be the same as they were in 1997. He stated that if he and his family were forced to return, he was concerned that there could be "very severe consequences" for them, and he speculated that he would be arrested or even killed.

During the asylum hearing, Gjerazi's wife and daughter also testified about their tumultuous lives in Albania and Gjerazi's involvement with the Democratic Party. Gjerazi's wife testified about the beatings she and her husband endured as well as her son's abduction. She corroborated her husband's testimony about his active participation in the Democratic Party and stated that she feared for their lives should they be forced to return to Albania. The IJ also requested that Gjerazi's ten-year-old daughter, Alba, testify. Although she recalled her brother's kidnaping, not surprisingly, she was unable to add much to the record, including anything about her father's political

---

[5]  Gjerazi testified that he did not want to remain in Italy because "there are so many Albanians and there are many incidents that happen there and people get killed . . . ."

activities.[6]

In addition to the testimony presented by the Gjerazi family, Dhimo Jano, a citizen of Albania who left the country in October of 1997, testified on their behalf. Jano knew and socialized with the Gjerazi family in Albania. Jano confirmed Gjerazi's membership in the Democratic Party and his position as a secretary within the party. He also described an incident that occurred in Albania in 1997 when he and Gjerazi were having coffee. He stated that he observed a member of the Socialist Party approach Gjerazi, point at him, and proclaim, "[T]his is the end of the Democratic Party." Jano also testified that, during the same year, he heard on the local news that Gjerazi's son had been abducted.

## B. Documents

Gjerazi recounted that when he left Albania in haste, he did not take the time to gather documents to support an asylum application because he had not yet determined what his destination would be or much less that he would eventually apply for asylum in the United States. When he did decide to apply for asylum, he asked his father-in-law, who was still in Albania, to obtain the necessary documentation to assist him in establishing his past membership in the Democratic Party and to prove his family's persecution in Albania.

Gjerazi submitted numerous documents to the IJ in support of his family's asylum applications. The IJ admitted in evidence documents marked as (1) group exhibit 1

---

[6] We find it surprising that the IJ asked Alba to testify. To expect a ten-year-old child to testify about political activities which her father was involved in when she was only seven or eight years of age seems rather remarkable.

(notices to all members of the Gjerazi family to appear), (2) group exhibit 2 (Gjerazi's asylum application and additional documents received from the INS pertaining to his application), (3) group exhibit 4 (documents which corroborated background information and country conditions in Albania), and (4) exhibit 5 (the *1999 Country Report on Human Right's Practices for Albania*, issued by the United States Department of State on February 25, 2000).[7] The IJ excluded from evidence a collection of documents labeled as group exhibit 3, A through K.[8] Exhibit 3-A is a copy of an arrest warrant for Gjerazi executed on September 15, 1998, following the demonstration protesting the assassination of Azem Hajdari. Exhibit 3-B is the notarized declaration of Luljeta Gjini, a neighbor of Gjerazi's in Albania, who attested to the beating of Gjerazi's wife. The declaration was executed on July 29, 1998. Exhibit 3-C is a medical certificate confirming Klarita's hospitalization after the attack in her home. The certificate states that Klarita was examined on July 2, 1997. Exhibits 3-D through F are certificates from the Commissariat of Police. Exhibit 3-D, dated June 8, 1997, confirms the kidnaping of Justin Gjerazi; exhibit 3-E, dated September 1, 1998, states that the Gjerazi home in Fier was destroyed by fire; and 3-F, dated August 3, 1998, states that Gjerazi was attacked on his way to Tirana in April of 1997.[9] Exhibit 3-G, dated

---

[7]  The *1999 Country Report* confirmed that the Democratic Party was the largest opposition party in Albania during the relevant time period. The report also states that while the government of Albania did not confirm any extrajudicial killings in 1999, the Democratic Party claimed that its members were harrassed and beaten by members of the ruling party.

[8]  The documents were marked as group exhibit 3 for identification purposes only.

[9]  Gjerazi testified that he did not think the attack in April of 1997
(continued...)

July 26, 1999, states that the Gjerazi family was persecuted by the communist regime in Albania. Exhibits 3-H and 3-I were purportedly issued by the Democratic Party.[10] These documents corroborate Gjerazi's testimony about his membership in the party, his election as a secretary in 1993, and the incidents of persecution suffered by his family. The final two documents, exhibits 3-J and 3-K, are copies of Gjerazi's Albanian passport and his Democratic Party membership card, respectively.

During Gjerazi's cross-examination, the government brought up discrepancies between the dates reflected on the documents and the dates of the incidents of persecution alleged by Gjerazi. A number of the documents were dated several months after the incidents occurred. When asked about the discrepancies in the dates, Gjerazi speculated that employees of the Commissariat of Police or notaries may have made a mistake while preparing the documents. However, he repeatedly explained to the IJ that he was unable to shed any light on the discrepancies in the dates, making clear that he was not the one who procured the documents from the police in Albania; consequently, he was not physically present to inspect the documents at the time they were either drafted or obtained. Furthermore, because questions about the documents did not arise until the time of the hearing, Gjerazi was unable to present an affidavit

---

[9] (...continued)
was politically motivated and that he did not intend to submit this document. The attack on June 5, 1997, also on the way to Tirana, was a separate incident for which he did not submit corroborating documentary evidence.

[10] The IJ's opinion highlights the fact that these letters were not written on official Democratic Party letterhead, a detail that the government focused on during cross-examination. Gjerazi testified that he had no explanation for why these documents were not composed on official letterhead.

from his father-in-law to explain the manner in which the documents were obtained and possibly to answer questions concerning the alleged discrepancies in the dates.

## C. The Decision of the Immigration Judge

On June 13, 2000, the IJ denied Gjerazi's application for asylum, withholding of removal, and protection under the Convention Against Torture. In his oral decision, the IJ concluded that "certain aspects of [Gjerazi's] claim appear to be supported by the Country Reports . . . ." and "certain aspects of [Gjerazi's] claim to persecution based on country conditions as they relate to political conflict between Socialists and Democrats are not . . . implausible." The IJ also found that "[Gjerazi] and his family have testified consistently with their written applications for Asylum." Despite these findings, the IJ concluded that the documents submitted in support of their asylum application, specifically group exhibit 3, "raised serious credibility issues." Focusing on the credibility issues raised by the documents, the IJ determined that Gjerazi "failed to meet his burden of proof."

The IJ stated that the manner in which the documents were obtained and submitted led him to the "inescapable conclusion that this claim must be denied" and that the use of false passports to enter the U.S. "triggered a series of questions about the other documents." He also questioned Gjerazi's decision to dispose of the Slovenian passports upon entry into the U.S., wondering why Gjerazi did not hand them over to the man who met them at the airport. The IJ found that this act "raised other questions about the respondent's credibility because the record shows that he had submitted copies of an Albanian passport for reasons

unknown."[11] The IJ also took issue with Gjerazi's testimony that the documents in group exhibit 3 were prepared on the dates of the incidents or shortly thereafter. The IJ reasoned, "If the documents were actually prepared on the dates which appear on their face this would raise significant questions about why [Gjerazi] would have his father-in-law obtain those documents when he himself was in Albania." Furthermore, the IJ questioned Gjerazi's testimony that the documents were photocopies of the original documents and concluded that the documents were not photocopies but were originals.

After excluding much of Gjerazi's corroborating documentary evidence, the IJ concluded that the record failed to establish the motivation of the persecutors. He described the Gjerazi family as "fortunate," "middle class" landowners who earned $3,000 per month running the family store, and stated that "[w]hat this Court is willing to accept given all of the questions raised by [Gjerazi's] testimony is that [Gjerazi] and his family had money which was targeted by criminals in Albania." In spite of the overwhelming evidence of political motive surrounding the attacks on the Gjerazi family, including several threatening statements made to the Gjerazis and recounted herein, the IJ speculated that the kidnaping of Gjerazi's son and the beating of his wife were motivated by financial gain and were not instigated by the Socialist Party.

---

[11] Gjerazi's counsel points out that Gjerazi submitted a copy of his Albanian passport to the immigration court for identification purposes.

**D. The BIA's Opinion**

On July 13, 2000, Gjerazi filed an appeal with the BIA. On March 31, 2004, the BIA issued its decision adopting and affirming the IJ's decision. In addition to adopting the IJ's decision, the BIA also supplemented the decision and addressed Gjerazi's contention that he was denied a full and fair hearing because of an incompetent translator.[12] The BIA found that Gjerazi caused the translator's difficulties when he failed to alter the rapidity of his speech in order to give the translator time to interpret his testimony. The BIA summarily concluded that Gjerazi failed to demonstrate "that a better translation would have made a difference in the outcome of the hearing."

On May 25, 2004, Gjerazi filed a timely petition for appellate review. Gjerazi alleges that he and his family have suffered past persecution as a direct result of his political activities. Gjerazi makes three arguments in support of his petition. Initially, he argues that the IJ incorrectly concluded that the physical and mental torture endured by the Gjerazis was criminally rather than politi-

---

[12] Throughout the asylum hearing, the immigration court's translator had difficulty interpreting Gjerazi's testimony. On one occasion, the IJ asked the translator, "You're having a hard time, Ms. Interpreter, aren't you? Well, here we go. Let's try it again." On another occasion, the IJ thought the translator had failed to properly translate the questions he was asking Gjerazi. The IJ asked her, "Did you interpret that . . . . Did you ask?" The IJ then stated, "Did you—did you interpret? I didn't hear the interpretation . . . ." The transcript also reveals several instances where the translator requested that certain questions and answers be repeated. After Gjerazi completed his testimony, this translator was replaced by a second translator who was able to translate the testimony of Gjerazi's wife and daughter without incident.

cally motivated. Gjerazi contends that his family was persecuted, at least in part, because of his political activities and membership in the Democratic Party. Next, Gjerazi argues that the IJ should have granted his family's request for asylum because they provided credible, convincing testimony about each incident of political retribution they suffered. Finally, Gjerazi argues that the IJ was on notice of the incompetence of the translator yet he still put undue weight on insignificant details in Gjerazi's testimony that might have been mistranslated. Based upon the record before us, we agree that Gjerazi's first two arguments alone are sufficient to compel a remand and we need not reach his third argument regarding the alleged incompetence of the translator.

## II. Analysis

### A. Standard of Review

When the BIA adopts the IJ's decision while supplementing the decision with its own reasoning, the IJ's decision, as supplemented by the BIA's decision, becomes the basis for review. *Niam v. Ashcroft*, 354 F.3d 652, 655-56 (7th Cir. 2004). Our review of the BIA's denial of asylum is deferential; we require only that the decision be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Li v. Gonzales*, 416 F.3d 681, 684 (7th Cir. 2005) (quoting *INS v. Elias-Zacarias,* 502 U.S. 478, 481 (1992)). We will reverse only if the evidence presented is "such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed*." Elias-Zacarias*, 502 U.S. at 481; *see also* 8 U.S.C. § 1252(b)(4)(B) (stating that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary").

Furthermore, "[c]redibility determinations are accorded substantial deference" and "should only be overturned

under extraordinary circumstances." *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999). However, they must be supported by "specific, cogent reasons." *Mansour v. INS*, 230 F.3d 902, 906 (7th Cir. 2000) (quoting *Ahmad*, 163 F.3d at 461). In addition, these reasons must "bear a legitimate nexus to the finding." *Id.* "We shall not defer to credibility determinations 'drawn from insufficient or incomplete evidence,' nor shall we uphold '[a]dverse credibility determinations based on speculation or conjecture, rather than on evidence in the record.'" *Korniejew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir. 2004) (internal citations omitted).

## B. Asylum

To be eligible for asylum, Gjerazi must demonstrate that he was a "refugee" under 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1)(A). The definition of refugee includes a person "unable or unwilling to return to [his home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Elias-Zacarias,* 502 U.S. at 481. The statute does not define the term "persecution," but we have held in the past that it may include "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, [ ] torture, behavior that threatens the same, and non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe." *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004) (internal citations omitted).

There are two avenues available to an alien seeking asylum. *See, e.g.*, 8 C.F.R. § 208.13. Under 8 C.F.R. § 208.13(b)(1), an applicant who successfully proves past persecution is presumed to have a well-founded fear of future persecution—a presumption that the government

can rebut by demonstrating a change in the conditions in the applicant's homeland. *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000); *see also Diallo v. Ashcroft*, 381 F.3d 687, 697 (7th Cir. 2004). Alternatively, under 8 C.F.R. § 208.13(b)(2), an applicant can affirmatively demonstrate a well-founded fear of future persecution if his fear is subjectively genuine and objectively reasonable in light of credible evidence. *Sayaxing v. INS*, 179 F.3d 515, 519-20 (7th Cir. 1999) (quoting *Tzankov v. INS*, 107 F.3d 516, 519 (7th Cir. 1997)). While the subjective fear component turns largely upon the applicant's own testimony and credibility, *id.* at 520, "[t]he objective component requirement can be met 'either through the production of specific documentary evidence or by credible and persuasive testimony.'" *Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005) (quoting *Balogun v. Ashcroft*, 374 F.3d 492, 499 (7th Cir. 2004)). The applicant is not required to establish certain persecution should he return or even demonstrate that persecution is highly probable; rather, the applicant need only demonstrate that persecution is a "reasonable possibility." *See Cardoza-Fonseca*, 480 U.S. at 430-432, 440 ("well-founded fear" of persecution is an objectively reasonable awareness of danger; the probability of persecution need not rise to the level of proof of "more likely than not.") ("One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."); *see also Ahmad*, 163 F.3d at 461.

"Proof of past persecution or a fear of future persecution is established, in part, by the information contained in the asylum application, including the alien's detailed statements about his mistreatment and other evidence, if available (i.e., birth certificates, passports, news articles, photos, hospital records, witnesses' affidavits)." *Capric*, 355 F.3d at 1085. However, in the majority of cases, the applicant supports his application by testifying before the IJ about the hardships he endured in his homeland. Given the

difficulty in directly authenticating or verifying an applicant's testimony, an IJ is called upon to make a reasoned and thorough credibility determination. "A credibility analysis assesses the applicant's claim only for internal consistency, detail, and plausibility, typically demonstrated by background evidence concerning general country conditions, if available . . . . If determined to be credible, the testimony of an alien alone may be sufficient to sustain the burden of proof without corroboration." *Id.* (internal citations omitted)

### 1. Credibility Determination

The general rule in immigration cases is that an asylum applicant whose testimony is otherwise credible need not produce corroborating evidence to support each and every element of his claim. *Lin v. Ashcroft*, 385 F.3d 748, 756 (7th Cir. 2004). This maxim is especially true when, as here, the asylum claim hinges almost exclusively on specific incidents "personally involving" the applicant and his family. *Bace v. Ashcroft*, 352 F.3d 1133, 1141 (7th Cir. 2003). As we noted in *Korniejew v. Ashcroft*, immigration judges should not "insist on corroborating evidence when common sense and institutional experience suggest that there is none to be had." 371 F.3d at 387.

In his decision, the IJ agreed that Gjerazi's account of his alleged political persecution was plausible and supported by independent state department reports. He also stated that "[Gjerazi] and his family have testified consistently with their written applications for Asylum." However, he determined that the documents submitted by Gjerazi raised serious concerns about Gjerazi's credibility. In excluding a number of Gjerazi's corroborating documents, the IJ reasoned that the documents were unreliable because the dates on the documents indicated that they were prepared before the Gjerazi family fled from Albania. The IJ found it

significant that Gjerazi failed to bring the documentation with him when fleeing Albania, opting instead to have his father-in-law send the documents after the family arrived in the U.S.

Contrary to the IJ's reasoning, which is most troubling, it seems illogical to require a family fleeing a country to take precious time to search for and collect documents in order to corroborate an asylum claim. Our primary concern is that the IJ failed to acknowledge that Gjerazi was not anticipating the need for those documents when or after he fled Albania. *See, e.g.*, *Grupee v. Gonzales*, 400 F.3d 1026, 1027 (7th Cir. 2005) (commenting that it would be difficult to "anticipate the need" for corroborating documentation while attempting to flee). As we pointed out earlier, Gjerazi made clear when he testified that he did not flee Albania intending to seek asylum in the U.S. As he explained in his asylum hearing, it was not until he and his family arrived in the U.S. that they decided to apply for asylum: "[W]hen I first got in United States [ ] my initial intention was not to stay here. I just wanted to leave the country, but I didn't know what I was going to do and then later on I realized that I had to apply for the political asylum and there were certain requirements that I had to meet and membership documents and certification so I asked my father-in-law to get the certification." It would not have made sense for the Gjerazis to wait to obtain documentation to corroborate an asylum claim when, at the time of their departure, they had no intention of seeking asylum. Furthermore, the IJ failed to recognize that Gjerazi left Albania in secrecy and fear, while a warrant for his arrest was outstanding, making it ill-advised for him to request documents from the police. The IJ did not consider that a request for this type of documentation might have raised a red flag with the Albanian authorities, jeopardizing his family's clandestine departure.

The IJ also excluded a number of Gjerazi's documents because Gjerazi testified that he believed certain documents to be copies while the IJ determined that they were originals. In *Kourski v. Ashcroft,* 355 F.3d 1038 (7th Cir. 2004), we addressed a similar situation. The petitioner in *Kourski* claimed that he had been persecuted in Russia by anti-Semites. During his asylum hearing, the only evidence Kourski presented of his Jewish heritage was his own testimony and a copy of a birth certificate. After the INS concluded that the birth certificate was counterfeit, Kourski explained that his mother had sent him the document and that he was neither aware nor had any reason to suspect that it was a forgery. Based on his conclusion about Kourski's birth certificate, the IJ concluded that Kourski was not credible and denied his asylum application. We vacated the removal order, reasoning that the IJ could have believed Kourski's testimony in the absence of any corroboration because "'the testimony of the applicant [for asylum], if credible, may be sufficient to sustain the burden of proof without corroboration.'" *Id.* at 1039 (quoting 8 C.F.R. § 208.13(a)) (alteration in original). We found the IJ's conclusion to be "unsupportable because the immigration judge did not find that Kourski knew or suspected that the birth certificate was a forgery," and there was no evidence that he or his mother knew it was not authentic. *Id.* We concluded that "if the applicant has no reason to know that the document is forged, its existence does not undermine his credibility, though it deprives his testimony of the extra boost to credibility that it would have if it were corroborated." *Id.* at 1040.

In the present case, the IJ concluded that the documents were not "trustworthy" because Gjerazi testified that the documents were copies while the IJ determined, without the benefit of any expert testimony, that the documents were originals. The IJ's decision to forgo the assistance of an expert in a situation such as this is perplexing. The

record reveals that Gjerazi's counsel requested that the documents be examined by the Forensic Document Laboratory for authenticity. However, without so much as providing a reason, the IJ refused, and, in doing so, he deprived Gjerazi, as well as the court on appeal, of a definitive determination as to the authenticity of the documents. Given that the IJ relied heavily on his analysis of the documents in questioning Gjerazi's credibility, in fairness he should have enlisted a qualified expert to assist him in determining whether the documents were copies or originals, particularly since the IJ did not question Gjerazi's credibility except in connection with the documents.

Furthermore, even assuming that the IJ was right and that the documents were originals, there is no evidence that Gjerazi knew or should have known that the corroborating documents were fraudulent. Like Kourski, Gjerazi testified that someone other than himself, in this case his father-in-law, obtained the documents. In all probability, Gjerazi never thought to have the documents examined for authenticity because he had no reason to suspect they were forged. Since no testimony or evidence was presented to demonstrate that Gjerazi was aware of, or much less responsible for, any authenticity problems, any confusion about whether the documents were copies or originals should not serve to undermine his credibility.

Gjerazi and his family presented testimony that was specific, detailed, consistent, and unambiguous, not "vague" or "lacking in internal consistency and plausibility." *Malek v. INS*, 198 F.3d 1016, 1020 (7th Cir. 2000) (written application and testimony provided by asylum applicant was markedly different from the information offered by applicant's wife) (internal quotations omitted). Gjerazi's testimony alone might very well have established eligibility for asylum, yet he, unlike the petitioner in *Kourski*, presented additional evidence in further support of his claim. Here,

the testimony of Gjerazi's wife was entirely consistent with Gjerazi's testimony. Furthermore, Dhimo Jano, Gjerazi's acquaintance from Albania, testified that Gjerazi was a member of the Democratic Party, had served as a secretary for the party, and had been threatened in 1997 by a member of the Socialist Party in Jano's presence. Jano also corroborated the testimony of Gjerazi, his wife, and his daughter that Gjerazi's son had been abducted.

Based on the credible and significant testimonial evidence presented by Gjerazi, we conclude that a "pressing" need for corroborating documentary evidence did not exist in this case, *Bace*, 352 F.3d at 1141, and that the IJ erred in discounting Gjerazi's otherwise credible testimony because he was skeptical of the corroborating documents, *cf. Dong v. Gonzales*, 421 F.3d 573, 577 (7th Cir. 2005) ("The IJ's skepticism alone, in light of [the applicant's] consistent testimony, does not support a negative credibility determination."); *Lin,* 385 F.3d at 755 (finding that unsupported skepticism is an insufficient basis for adverse credibility finding); *Georgis v. Ashcroft*, 328 F.3d 962, 969 (7th Cir. 2003) (finding that IJ cannot base an adverse credibility finding on an applicant's failure to produce corroborating evidence when the IJ himself was responsible for creating the problem by erroneously excluding the evidence produced by the applicant).[13]

---

[13] In its brief, the government mentions a number of additional reasons to uphold the IJ's decision to exclude the evidence or otherwise find Gjerazi not credible; however, these reasons were not relied on by the IJ in reaching his decision. Thus, under the *Chenery* doctrine, we cannot uphold the IJ's decision based on these grounds. *See Comollari v. Ashcroft*, 378 F.3d 694, 696 (7th Cir. 2004).

*2. Past Persecution*

Although the IJ stated that the corroborating documents submitted by the Gjerazi family raised "serious concerns," he did not specifically find that these concerns led him to deny their application for asylum. Perhaps because he realized that he could not deny Gjerazi's application based on documents that were not admitted into evidence, the IJ shifted his focus to Gjerazi's past persecution claim and concluded that the Gjerazis' persecution was not politically motivated. We conclude that such a finding, which is confusing and ignores significant portions of the evidence, is not supported in the record.

The Gjerazis present a most compelling case of past persecution. In fact, the record reveals at least five serious incidents in which the Gjerazi family appears to have been the target of political militants while Gjerazi was actively participating in the activities of the Democratic Party. On June 5, 1997, masked assailants beat Gjerazi until he lost consciousness while en route to a party meeting, telling him that he would not be going "to meet the celebration in Tirana." Later that same day, unidentified callers threatened him with "very bad consequences" if he did not adjust the election returns in order to ensure the success of the Socialist Party. On June 8, 1997, just three days after Gjerazi's beating, his two-year-old son was kidnaped, and the abductors called the Gjerazis and initially conditioned the child's release on the Socialist Party winning the vote in Fier. It was only after Gjerazi's father informed the kidnapers that Gjerazi was not in a position to guarantee this result that the kidnapers, as a second option, agreed to release the child for a ransom of $5,000. Then, on July 2, 1997, one month after his son's abduction, intruders broke into Gjerazi's apartment, searching and calling out for Gjerazi. When they could not locate him in the apartment, they beat Gjerazi's wife into a state of unconsciousness, hospitalizing her for ten

days. In April of 1998, on a night when Gjerazi attended a
Democratic Party monthly meeting, Gjerazi's apartment
was set on fire while he was in the building. Although he
escaped, his home was completely destroyed. The final
incident occurred in September of 1998, when Gjerazi
returned to Fier to attend a peaceful demonstration in
protest of the assassination of Azem Hajdari, a Demo-
cratic Party official. Shortly after the demonstration, the
Albanian authorities, controlled by the Socialist Party,
issued a warrant for his arrest. With the exception of
these final two incidents, the remainder of the incidents
occurred in the months surrounding Albania's 1997 national
elections and were accompanied by statements, seemingly
made by followers of the Socialist party, which indicated
that the attacks were politically motivated.

In the face of ample, consistent, seemingly credible
testimony about these incidents from Gjerazi, his wife
and daughter, plus a family friend, the IJ rejected a finding
that the Gjerazis' persecution was politically motivated.[14]
Rather, he focused almost exclusively on the incidents that
he concluded were the product of general criminal lawless-
ness in Albania. Despite abundant evidence in the record,
his analysis ignored the beating sustained by Gjerazi, the
fire that destroyed his home, the undeserving warrant
issued for his arrest, and, most misleading, the timing of
the events and the political statements accompanying these
instances of persecution. Instead, he engaged in arrant
speculation when he concluded that both the abduction of

---

[14] In addition to refusing to find that the Gjerazis' persecution was
politically motivated, the IJ also failed to make a specific finding
as to whether the alleged mistreatment suffered by the Gjerazis
was sufficiently severe to qualify as persecution, despite the
beatings of Gjerazi and his wife, the kidnaping of his child, and
the destruction of his home.

Gjerazi's son and the beating of his wife were motivated solely by financial gain.[15]

Even if we were to agree with the IJ that the kidnaping and home invasion were motivated in part by economic remuneration, of which we are not convinced, that theory does not exclude the possibility of a "mixed motive" situation. *See Mohamed v. Ashcroft*, 396 F.3d 999, 1004 (8th Cir. 2005). "A persecutor may have multiple motivations for his or her conduct . . . ." *Lukwago v. Ashcroft*, 329 F.3d 157, 170 (3d Cir. 2003). While an alien is required to provide some evidence of motive, direct or circumstantial, *Elias-Zacarias,* 502 U.S. at 483, he or she must only demonstrate that the persecutor was motivated, "at least in part, by one of the enumerated grounds." *Lukwago*, 329 F.3d at 170. This circuit recently joined several other circuits and formally adopted the doctrine of mixed motives, "which recognizes that an individual may qualify for asylum if his or her persecutors have more than one motive as long as one of the motives is specified in the Immigration and Nationality Act ("INA")." *Mohideen v. Gonzales*, 416 F.3d 567, 570 (7th Cir. 2005); *De Brenner v. Ashcroft*, 388 F.3d 629, 636 (8th Cir. 2004); *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 236 (4th Cir. 2004); *Girma v. INS*, 283 F.3d 664, 667 (5th Cir. 2002); *Borja v. INS*, 175 F.3d 732, 735-36 (9th Cir. 1999); *Chang v. INS*, 119 F.3d 1055, 1065 (3d Cir. 1997).

In his decision, the IJ fleetingly referred to the doctrine of mixed motives but failed to thoroughly discuss and evaluate the evidence of dual motive that Gjerazi presented. In concluding that the evidence demonstrated that the family was "targeted by criminals" and not political persecutors, the IJ focused exclusively on Justin's kidnaping and

---

[15] Unless it is severe, economic persecution alone is generally insufficient to entitle an applicant to asylum. *See Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1119 (7th Cir. 2004).

Klarita's assault, both of which exhibited a secondary economic component. In discussing the kidnaping and the assault on Gjerazi's wife, the IJ dismissed testimony that the assailants made contemporaneous statements indicating that the attacks were politically motivated and disregarded the timing of the attacks. He also failed to acknowledge that the kidnapers initial request was for Gjerazi to fix the 1997 elections, not for a ransom. Even more glaring, he ignored the other incidents of persecution that befell the Gjerazi family. In our opinion, these other incidents (Gjerazi's severe beating en route to a Democratic Party meeting, the arson following a party meeting, and the arrest warrant issued after Gjerazi's attendance at a political protest), exuded political motivation and absolutely no economic motivation, yet the IJ failed to discuss the readily evident political motive for these attacks and, in doing so, ignored key evidence.

We have previously held that an applicant is entitled reasoned analysis, not one which wholly ignores or disregards relevant, probative evidence. *See Mohideen*, 416 F.3d at 571; *Tolosa v. Ashcroft*, 384 F.3d 906, 909-10 (7th Cir. 2004) (discussing IJ's failure to consider key evidence); *Lian v. Ashcroft*, 379 F.3d 457, 461-62 (7th Cir. 2004) (highlighting all relevant evidence ignored by the IJ). In concluding that the attacks on the Gjerazi family were not politically motivated, the IJ erred in ignoring those incidents which exhibited no economic motivation and by disregarding the evidence of political motivation in the incidents he considered. Like all asylum applicants, Gjerazi is entitled to a well-reasoned, documented, and complete analysis that engages the evidence he presented, particularly the ample evidence demonstrating a political motivation for his persecution. *Mohideen*, 416 F.3d at 571. The IJ's decision falls far short of this standard, and we hold that his conclusions are not supported by substantial evidence in the record.

### III.  Conclusion

We GRANT the petition for review, VACATE the BIA's order, and REMAND for further proceedings consistent with this opinion. We suggest that the BIA consider re-assigning this matter to another judge on remand. *See* Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit; *see also Kerciku v. INS*, 314 F.3d 913, 919 (7th Cir. 2003).

A true Copy:

     Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*