UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued March 1, 2006
Decided July 21, 2006

**Before**

Hon. FRANK H. EASTERBROOK, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-1611

| | |
|---|---|
| EVA NAKIBUUKA, *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals |
| *v.* | No. A97-497-382 |
| ALBERTO R. GONZALES, Attorney General of the United States, *Respondent*. | |

**O R D E R**

Eva Nakibuuka, a native and citizen of Uganda, claims that she was persecuted by the Ugandan government because of her association with the Democratic Party and a false allegation of complicity with guerrillas seeking to overthrow the government. An Immigration Judge ("IJ") found her testimony incredible and denied her petition for asylum, withholding of removal, and protection under the Convention Against Torture. The Board of Immigration

Appeals ("BIA") affirmed. Because the IJ's decision is supported by substantial evidence,[1] we deny Nakibuuka's petition for review.

## I.

Nakibuuka entered the United States on a six-month visitor's visa in October 2002 and petitioned for asylum before the visa expired. At her asylum hearing, she testified that she and her father were affiliated with Uganda's Democratic Party, the principal opposition party against President Yoweri Museveni. Nakibuuka claimed that for five years her father belonged to the Democratic Party's National Executive Committee. He also owned a 50-room hotel, which was sometimes used for political meetings. According to Nakibuuka, she herself was "secretary on the women's wing" of the Party and helped with literacy, birth control, and economic sustenance projects for women.

Nakibuuka testified that during the 2001 presidential elections, both she and her father campaigned for independent compromise candidate Kizza Besigye. She testified that her father was murdered during the campaign by government officers seeking information about Besigye. She took over management of the hotel following her father's death. In September 2002, when she was four-and-a-half months pregnant, soldiers in army uniforms detained her for questioning. They accused her of "hosting wrong people in the hotel," stockpiling guns, and conspiring with Besigye to overthrow the government. She claimed the soldiers repeatedly interrogated her, beat her with a metal chair, and "tortured [her] with snakes." After two weeks she escaped with the help of a guard who had been bribed by her brother. She was taken by a friend to a government hospital where she was treated for a "septic incomplete abortion" and underwent a cesarean operation. When she was released from the hospital, the same friend helped her obtain a visa to the United States.

Nakibuuka arrived at Chicago's O'Hare International Airport in October 2002. She testified that she spent her first week at a hotel near the Woodfield Mall, and while at the mall she happened to meet a fellow Ugandan who agreed to give her room and board in exchange for babysitting while he and his wife were at work.

Nakibuuka submitted a number of documents to corroborate her story, including a letter from her sister attesting to efforts by the government to locate her

---

[1]Nakibuuka petitioned for asylum in March 2003; therefore, her case is not affected by the revised credibility standards of the REAL ID Act of 2005, *see* Pub. L. No. 109-13, 119 Stat. 231. The new standards apply only to petitions for asylum made on or after May 11, 2005. *Id*. at § 101(h)(2). *See also Diallo v. Gonzales*, 439 F.3d 764, 766 n.1 (7th Cir. 2006); *Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005).

after her escape, a 2002 "trading license" for the hotel, a business registration for the hotel from 1990, news reports about disappearances and torture inflicted on persons associated with Besigye or the Democratic Party, and a document purporting to be a medical report from the hospital that treated her after her escape from detention.

The IJ found Nakibuuka not credible. He noted, among other reasons, that her asylum application did not mention that her father had been murdered—a significant omission. The IJ also observed that Nakibuuka failed to corroborate that she was a member of the Democratic Party or that she had operated the hotel after her father's death; in his view she should have been able to furnish evidence in the form of documentation from Democratic Party officials and bank records showing the business activity of the hotel. Moreover, the IJ was skeptical of the evidence Nakibuuka *did* provide, especially the medical report, which was dated February 2, 2002, yet purported to describe treatment rendered in September 2002. The IJ also considered the letter from Nakibuuka's sister to be "suspect" because while supposedly unsolicited and written solely to inform Nakibuuka of her family's circumstances, it "mirror[ed]" Nakibuuka's asylum application.

The BIA adopted and affirmed the IJ's opinion, emphasizing the "shortcomings" of the medical report, which the BIA considered "adequate, without more, to draw into serious question the veracity of [Nakibuuka's] entire claim." Nakibuuka also argued before the BIA that she had not received a fair hearing because (1) she was denied advance notice that the government planned to attack the authenticity of her documents, (2) she was denied the opportunity to examine certain notes from an asylum interview used by the government to impeach her, and (3) the IJ exhibited bias against her. The BIA concluded Nakibuuka had been afforded sufficient opportunity to respond to all of the government's arguments about the authenticity of her documentary evidence. The BIA also rejected her argument about the asylum interview notes because the IJ did not rely on the interview notes in making his adverse credibility determination. Finally, the BIA held that the record did not support Nakibuuka's claim that the IJ was biased.

## II.

When the BIA adopts the IJ's decision but articulates some reasoning of its own, we review both decisions. *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006); *Giday v. Gonzales*, 434 F.3d 543, 547 (7th Cir. 2006). We review the denial of an asylum application under the substantial evidence standard. *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005). This deferential standard of review requires that we uphold the decision of the agency if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quoting *Lin v. Ashcroft,* 385 F.3d 748, 751 (7th Cir. 2004)). Credibility

determinations are accorded considerable deference and are overturned only under extraordinary circumstances. *Gjerazi*, 435 F.3d at 807. We require only that an adverse credibility determination be supported by "specific, cogent reasons" with a "legitimate nexus to the finding." *Kllokoqi,* 439 F.3d at 341 (internal citation and quotation omitted); *see also Shtaro v. Gonzales*, 435 F.3d 711, 715 (7th Cir. 2006).

Nakibuuka first argues that the IJ had no cogent reason for doubting the authenticity of the medical report. We disagree. On its face, the report contains an obvious inconsistency in that it is dated some seven months before the treatment it purports to describe was rendered. The IJ also observed that the report made no mention of the cesarean operation Nakibuuka claimed to have undergone. The IJ was entitled to rely on these unexplained discrepancies as part of his adverse credibility determination. *Balogun v. Ashcroft,* 374 F.3d 492, 500 (7th Cir. 2004).

Although the BIA found these facial "shortcomings" in the medical report sufficient by themselves to undercut Nakibuuka's claim, the IJ's adverse credibility determination was premised upon additional specific, cogent reasons. The IJ noted that Nakibuuka failed to mention her father's murder in her asylum application. This omission is striking because the murder was recent—allegedly occurring less than two years before Nakibuuka's own claimed persecution—and because it allegedly stemmed, like her detention, from suspicion of involvement with Kizza Besigye. Also, the IJ found the letter from Nakibuuka's sister suspicious because its details belied Nakibuuka's claim that it was an unsolicited communication between sisters. For instance, when Nakibuuka's sister referred to their father, she set forth his full name—first and last—and added that he was "a former D.P. member." The IJ noted that the letter essentially "mirror[ed]" Nakibuuka's asylum application. Finally, the IJ was skeptical of Nakibuuka's story about being taken in by a fellow Ugandan whom she just happened to "run across" in the Woodfield Mall during her first week in the United States.

The IJ also relied on Nakibuuka's failure to corroborate her claims that she was a secretary for the Democratic Party and that she operated her father's hotel after his death. We see no error in this expectation of corroboration. Nakibuuka argues that the IJ did not recite or apply our three-part test for determining whether corroboration is necessary, *Gontcharova v. Ashcroft,* 384 F.3d 873, 877 (7th Cir. 2004), but we think the IJ's explanation of the need for corroboration in this case was adequate. As we have noted, the IJ specifically explained why he did not find Nakibuuka credible and articulated a reasonable expectation of corroboration of her Democratic Party membership and management of the hotel. *See Hussain v. Gonzales*, 424 F.3d 622, 629 (7th Cir. 2005); *Fessehaye v. Gonzales*, 414 F.3d 746, 756 (7th Cir. 2005); *Balogun,* 374 F.3d at 500.

Nakibuuka also attacks the IJ's corroboration ruling by arguing that he should have notified her before the hearing that her documentation was inadequate. But the cases she cites do not support this position, and we are not aware of any requirement that such advance notice be given. In any event, she makes no attempt to show that with advance notice the outcome of her case would have been different. *See Rehman v. Gonzales*, 441 F.3d 506, 509 (7th Cir. 2006); *Szczesny v. Ashcroft*, 358 F.3d 464, 465-66 (7th Cir. 2004).

Finally, Nakibuuka reiterates her generalized argument that she was deprived of due process because the IJ exhibited bias against her in that he became irritated with her counsel and "ignored" his objections to some of the government's questions and because the IJ refused to order the government to turn over the asylum interview notes it used to impeach her. We have warned petitioners against making "open-ended due process argument[s]." *See, e.g., Rehman*, 441 F.3d at 508-09. In any event, we agree with the BIA that Nakibuuka was not deprived of a fair hearing because the IJ did not rely on the asylum interview notes and the record does not support her contention that the IJ was not neutral.

For the foregoing reasons, the petition for review is DENIED.