NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 18, 2007
Decided April 23, 2007

**Before**

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. JOEL M. FLAUM, *Circuit Judge*

No. 06-3716

| | |
|---|---|
| CESAR LOPEZ-MONTERROSO, *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals |
| *v.* | No. A78-974-368 |
| ALBERTO R. GONZALES, Attorney General of the United States, *Respondent*. | |

**O R D E R**

Cesar Lopez-Monterroso, a citizen of Guatemala, petitions for review of the denial of his application for asylum. An Immigration Judge denied that application after an evidentiary hearing, but the basis for the IJ's decision is muddled. The IJ criticized Lopez for not submitting corroborating evidence, and that omission might be one reason why the IJ denied relief. Whether or not it was, however, the IJ explicitly concluded that the reasons Lopez gave for fleeing Guatemala did not rise to the level of past persecution. The Board of Immigration Appeals affirmed. Although the IJ's demand for corroboration is problematic, Lopez does not challenge the IJ and BIA's ultimate conclusion that what happened to him in Guatemala was not persecution. That conclusion is supported by substantial evidence. Accordingly, we deny the petition for review.

Lopez entered the United States illegally on March 28, 2002. He was arrested two days later, and the former Immigration and Naturalization Service immediately issued a Notice to Appear and commenced removal proceedings, charging him with being present in the United States in violation of 8 U.S.C. § 1182(a)(6)(A)(I).

Lopez conceded his inadmissibility and applied for asylum and withholding of removal on the basis of his religion and membership in a particular social group. He stated in his application that he was "threatened by criminal gangs in Guatemala" because he didn't want to join them. According to Lopez, the "criminal gangs do anything they want in Guatemala, because the police and the government can't or won't do anything to stop them. They kill and harm a lot of young men who don't join them, because they view us as a threat to their power." He asserted that he would be in danger of "persecution" by the criminal gangs if he returned to Guatemala. He also added that he came to the United States in order to rejoin his mother, Yolanda Monterroso, who is an asylum applicant here.

In support of his application for asylum, Lopez submitted declarations from himself and his mother. In his declaration Lopez states that he was "forced to leave Guatemala" because he had been "constantly beaten and threatened by criminal gangs, for refusing to join any of the gangs." He describes constant fighting in his town, which is home to two rival gangs: "There was very fierce shooting all the time, like in a war, right in the town. It never stopped." According to Lopez, one gang tried to recruit him at age 14 and told him that he would be beaten and required to use drugs with members of the gang. Lopez refused to join "even though almost all the young men from the town had become part of one gang or another." He resisted, he says, partly because he is a devout Christian and the gangs oppose churches, which the gangs view as their rivals for control over the community. Because of his continued resistance to gang membership, Lopez says, he was beaten up "about 14 different times" by gang members. Lopez never went to the hospital because he didn't want to wait the six hours it would take until he was treated. He also "never bothered" to go to the police or other authorities because the "police are more afraid of the gangs than anybody, and they are powerless to prevent violence." Had he made a complaint, Lopez adds, the gangs simply would have taken revenge on him. In his declaration Lopez explains that he was in frequent communication with his mother, who left Guatemala for the United States when he was 13. She often sent him money, and gradually he saved up enough to leave the country. His decision to move was sparked by his witnessing the shooting death of a young man by a group of other men. The next day, an acquaintance said she had seen him there and knew that he saw what happened. Lopez feared that the killers were gang members who would come after him and possibly kill him to keep him quiet.

In her declaration, Yolanda Monterroso states that she applied for asylum because her husband, Lopez's father, was beaten to death by guerillas near their home. She knew that gangs had been trying to recruit her son since he was a teenager and had attacked him for resisting. She states her belief that he was in "constant danger" in Guatemala. She also confirms that she and her son are devout Christians.

After several continuances, Lopez appeared before an IJ in May 2005. He testified that he was born in 1982 in Guatemala. He explained that he left Guatemala because young gang members oppress many people there, especially Christians. Lopez said that in Guatemala he attended his church, the Light of the World, three times a week. When he would leave church, gang members would "be judging" him and would hit him. This happened about 12 or 13 times between 1998 and 2002. Lopez said he thought he was targeted because the gang members wanted him to join and "didn't want to see [him] in church." On one occasion, when Lopez was coming home from work, three gang members pushed him off his bicycle into a drainage ditch, causing him to break his teeth. This was the only injury for which he sought medical attention. Lopez testified, though, that he never went to the police because he knew the police would not help him; it is common knowledge, he said, that the police "just give a paper and they don't really act on it." Lopez said that he spoke with his mother once a week when he was in Guatemala, describing his troubles, and she sent him about $1300 for him to come to the United States. Lopez testified that just 15 days prior to the hearing, his 16-year-old cousin, who had started attending his church, was shot to death, presumably by gang members. Lopez stated that if he returned to Guatemala he would be in danger from the gangs because they have gotten bigger and "can't stand to see a person walking with a Bible under their arm."

The IJ issued an oral decision denying relief. The IJ began with this characterization of Lopez's claim: "Basically, the respondent has testified that he left Guatemala to come to the United States to join his mother and brother here in the United States. Apparently, the mother had departed when he was 13 years of age." The IJ then commented that "regretfully, people think gold is on the streets, and all one has to do is come to the United States and pick them up from the roadside without the incumbent requirement to earn a living." The IJ concluded, "The fact that the respondent came to the United States to join his mother undercuts his claim of the purpose of his departure from Guatemala." The IJ acknowledged Lopez's testimony that he was assaulted by Guatemalan gangs that wanted to persuade him to stop going to church and join them, but the IJ expressed skepticism about this testimony because Lopez had managed to live in Guatemala until age 19 without joining a gang.

The tenor of the IJ's order discloses his skepticism about Lopez's testimony, but the IJ never made an explicit finding that Lopez was not credible. Despite this omission, however, the IJ emphasized the lack of corroboration for Lopez's account of his experiences in Guatemala. Lopez submitted only his mother's declaration as corroborating evidence, and the IJ concluded that her declaration was "not persuasive" because she left Guatemala when Lopez was 13 and "would not have any particular knowledge of the incidents in question." The IJ observed that Lopez knows numerous relatives and members of his former church still living in Guatemala who could have sent affidavits backing up his story. Because this evidence was available, the IJ reasoned, "there should be an explanation why it is not present." The explanation Lopez gave, however, is that he did not try to obtain corroborating evidence, which, in the IJ's view, further "undercuts his claim." The IJ concluded that, given the "lack of corroboration, the respondent's credibility is in question." And though acknowledging that an applicant's testimony may be enough to sustain his burden of proof without corroboration, *see* 8 C.F.R. § 208.13(a), the IJ asserted that "the submission of supporting documents is not optional." The IJ insisted: "An applicant has to be able to satisfactorily establish his or her failure to provide the Court with corroborating or supporting documents of both general country conditions and specific facts. . . . A complete lack of corroborating evidence can prevent an applicant from sustaining his burden of proof."

But contrary to the representation Lopez makes in his brief, it is difficult to tell whether the IJ concluded that a lack of corroborating evidence was a sufficient ground to deny asylum. What is clear, however, is that the IJ held—expressly—that Lopez's "account of the circumstances for his fleeing to come to the United Sates from Guatemala because of fear . . . of gang-related activities does not rise to the level of past persecution." The IJ stated that he was not persuaded by Lopez's assertion that the police do not get involved in stopping gang-related violence. The IJ reasoned that, since Lopez never reported to the police any of the alleged assaults, "it's doubtful that the authorities were aware of the respondent's particular situation and one cannot therefore relate that the government was unable to protect the respondent." The IJ also concluded that Lopez had failed to establish he was a member of a particular social group; the IJ rejected Lopez's contention that there is a recognized social group comprised of young male members of Christian churches who are targeted by gangs as potential recruits. In addition, the IJ found that Lopez had not established his claim of religious persecution, which the IJ suggested that Lopez had added as an "afterthought."

The BIA affirmed in a brief order noting that the IJ "correctly determined that the respondent failed to establish past persecution, a well-founded fear of future persecution, or a clear probability of persecution on account of a qualifying group." While the BIA noted "with some concern" the IJ's comment about picking

up gold on the streets, it did not believe that this "inappropriate comment" exhibited personal bias rendering the hearing unfair. The BIA stated that the IJ "did not find the respondent incredible" but concluded instead that he failed to satisfy his burden of proof with respect to his asylum claim.

In his petition for review, Lopez argues that the IJ inappropriately denied his application due to a lack of corroborating evidence without first making an explicit adverse credibility finding. Lopez asserts that the IJ's reasoning is speculative and unsupported by the administrative record because the IJ believed that Lopez's real reason for leaving Guatemala was his desire to rejoin his mother. Lopez points to the IJ's inappropriate generalization about "gold-digging, work-averse immigrants" as evidence of the IJ's "unsupported presumptions" about his motivation for coming to the United States. What Lopez *does not do*, however, is address—or even acknowledge in his brief—the IJ's conclusion that Lopez's account of what happened to him in Guatemala does not make him eligible for asylum regardless of his credibility.

When the BIA adopts the IJ's decision but articulates some reasoning of its own, we review both decisions. *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006); *Giday v. Gonzales*, 434 F.3d 543, 547 (7th Cir. 2006). The denial of asylum is reviewed under the substantial-evidence standard. *Kllokoqi v. Gonzales*, 439 F.3d 336, 341 (7th Cir. 2005). This deferential standard requires that the court uphold the decision of the agency if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *see Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004). We will overturn the agency's decision only if "the record compels a contrary result." *Mabasa v. Gonzales*, 455 F.3d 740, 744 (7th Cir. 2006) (citation omitted).

Review of the corroboration issue is limited by § 101(e) of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (amending 8 U.S.C. § 1252(b)(4)), which provides that "no court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." *Id*. § 101(e). This provision applies in Lopez's case.

*See id.* § 101(h); *Orejuela v. Gonzales*, 423 F.3d 666, 671 (7th Cir. 2005); *Hor v. Gonzales*, 421 F.3d 497, 500-01 (7th Cir. 2005).[1]

An applicant seeking asylum bears the burden of establishing that he is a refugee, but an applicant's credible testimony can sustain this burden of proof without corroboration, 8 U.S.C. § 1158(b)(1)(B). On the other hand, an IJ may find an applicant's testimony not credible if he "fails to present certain foundational evidence." *Balogun v. Ashcroft*, 374 F.3d 492, 502 (7th Cir. 2004). To ensure that IJs have the freedom to require supporting evidence, yet do not inappropriately demand it, we require that, before denying a claim for lack of corroboration, an IJ must "(1) make an explicit credibility finding; (2) explain why it is reasonable to have expected additional corroboration; and (3) explain why the petitioner's reason for not producing that corroboration is inadequate." *Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006); *accord Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004).

In this case the IJ did not explicitly make an adverse credibility finding, as the BIA acknowledged. Had the IJ then denied Lopez's asylum claim due to the lack of corroboration alone, we would have cause to vacate and remand. *See Diallo v. Gonzales*, 439 F.3d 764, 766 (7th Cir. 2006) (holding that IJ failed to make explicit credibility finding when he described applicant's testimony as "general" and "meager," making his demand for corroborating evidence improper). But the IJ and BIA went on to evaluate the substance of Lopez's asylum claim and determined that he had not met his burden of proving past persecution or a well-founded fear of persecution on account of religion or membership in a particular social group. *See* 8 U.S.C. §§ 1158(b)(1)(B)(i), 1101(a)(42)(A). We may uphold the denial of asylum on the basis of this latter determination if substantial evidence supports it. *Hui-Mei Li v. Gonzales*, 416 F.3d 681, 684-685 (7th Cir. 2005).

The attacks on Lopez never amounted to persecution because the perpetrators were not governmental actors and there is no evidence that the Guatemalan government encouraged their behavior or was unwilling to protect Lopez. We have reasoned that an asylum applicant "cannot even claim asylum on the basis of persecution by a private group unless the government either condones it

---

[1] Under the REAL ID Act of 2005, Pub. L. No. 109-13, § 101(a)(3)(B)(ii), 119 Stat. 231, an IJ may require an otherwise credible applicant to provide corroborating evidence unless the applicant does not have the evidence and cannot reasonably obtain it. Unlike § 101(e), this provision, which cabins the scope of our review, affects only asylum applications filed after May 11, 2005, and therefore did not apply at Lopez's hearing before the IJ. *See Dawoud v. Gonzales*, 424 F.3d 608, 613 (7th Cir. 2005).

or is helpless to prevent it." *Hor*, 421 F.3d at 501; *see also Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006) (explaining that a government abets private discrimination only if it "is unwilling and completely unable to afford protection."). Lopez admitted that he never reported, or attempted to report, any of the gang attacks to the police. We require more than Lopez's conjecture that the police would be indifferent to his plight. *Cf. Hor*, 421 F.3d at 502 (holding that actions of radical Islamists could be attributed to government where military told petitioner it could not protect him from terrorists and Algerian court advised him to "keep a low profile"); *Guchshenkov v. Ashcroft*, 366 F.3d 554, 557 (7th Cir. 2004) (holding that actions of Kazakh thugs could be attributed to government where police responded to petitioner's assault report by saying they had "more important things to take care of"). The IJ did not err in concluding that the attacks and harassment by the gangs did not constitute persecution, and in his brief Lopez doesn't argue otherwise.

Finally, Lopez briefly contends that the IJ denied him due process during his hearing. According to Lopez, the IJ questioned him so extensively that he essentially had "no real hearing at all." Lopez's due process rights were not violated by the IJ's conduct during the hearing. This is not a case, for instance, in which the IJ barred "complete chunks of oral testimony that would support the applicant's claims," *Kerciku v. INS*, 314 F.3d 913, 918 (7th Cir. 2003), or curtailed an applicant's testimony on matters that go to the heart of the claim, *Podio v. INS*, 153 F.3d 506, 509-10 (7th Cir. 1998), or where evidence excluded by the IJ "had the potential for affecting the outcome of the proceedings." *Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 540 (7th Cir. 2005). The IJ may have interjected questions, even on matters that Lopez considers peripheral to his asylum claim, but none of this shows that he was denied "a meaningful opportunity to be heard." *Nazarova v. INS*, 171 F.3d 478, 482 (7th Cir. 1999). Nor has Lopez made any showing of prejudice—by identifying, for example, the testimony or evidence that he would have presented but for the IJ's conduct. *See Kharkhan v. Ashcroft*, 336 F.3d 601, 606 (7th Cir. 2003); *Kerciku*, 314 F.3d at 918.

The petition for review is DENIED.