# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-1690

_____

United States of America,            *

                              *

         Plaintiff-Appellee,     *

                              *   Appeal from the United States

     v.                     *   District Court for the Eastern

                              *   District of Arkansas.

                              *

Jimmy Albern Boyster,        *

                              *

         Defendant-Appellant.   *

_____

Submitted: November 14, 2005
Filed:  February 10, 2006

_____

Before MURPHY, McMILLIAN[1], and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

After Jimmy Boyster was indicted for possessing and manufacturing marijuana, he moved to suppress the evidence seized during a search of his property and statements he made to officials at the scene.  The district court[2] denied the motion, and Boyster subsequently entered a conditional guilty plea and was sentenced to 42

_____

[1]The Honorable Theodore McMillian died January 18, 2006.  This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E.

[2] The Honorable James M. Moody, United States District Judge for the Eastern District of Arkansas.

months imprisonment. Boyster appeals, arguing that the use of the Arkansas National Guard to aid local law enforcement in the aerial surveillance of his property was unlawful and that the evidence resulting from the subsequent search of the premises should be suppressed. We affirm.

On July 17, 2002, the Arkansas State Police (ASP) and the Arkansas National Guard (the Guard) conducted aerial surveillance over portions of southern Arkansas. The operation was conducted pursuant to the Arkansas National Guard FY 2002 Counterdrug Support Plan. Both the Governor of Arkansas and the Attorney General of Arkansas had certified that the plan complied with federal and state law. Under the plan the Guard provides support to local, state, and federal law enforcement agencies in targeting and eliminating illicit drug operations.

The two helicopters involved in this surveillance were flown by Guard pilots, and spotters from the Guard and the ASP observed quantities of marijuana growing around Boyster's residence and notified authorities on the ground. Based upon this information, law enforcement officers from the Drug Enforcement Administration (DEA) and ASP, as well as Guard personnel proceeded to Boyster's residence. They told Boyster what the aerial surveillance had uncovered and asked for his consent to search the premises. He acquiesced, and the search revealed over 2400 marijuana plants growing on his property. The officers also discovered an eighteen wheel box trailer with an electric cord running to Boyster's residence. The trailer contained suspended fluorescent lights and bags of potting soil, and underneath it marijuana plants were growing in plain view.

Boyster was indicted on March 11, 2003 for possessing and manufacturing marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2(a). He moved to suppress all evidence gathered as a result of the aerial surveillance, arguing that the use of the Guard in a drug eradication flight was unlawful under Arkansas law without a written proclamation from the governor calling up the Guard and

authorizing it to participate in local law enforcement operations. Boyster further argued that the aerial surveillance violated his fourth amendment rights because local law enforcement had received unlawful assistance from the Guard. He asked that all evidence from the subsequent search be suppressed, including the incriminating statements he made to investigators.

The district court held a suppression hearing on March 22, 2004 and heard from ASP special agent Dennis Roberts, lieutenant colonels Richard Moore and Ray House from the Guard, and Boyster. Agent Roberts testified that there were bush hogged[3] trails visible from the air which led from Boyster's residence to other large plots of land. He also described the amount and location of marijuana found on Boyster's property and testified that Boyster had signed a consent form authorizing a search of the property.

Lieutenant Colonel Moore testified that, as the Counterdrug Coordinator for Arkansas, he provided support to local law enforcement during this operation. He was responsible for ensuring that the National Guard was acting in compliance with federal and state law pursuant to a valid state plan signed by the governor. On cross examination he testified that the plan for the current year would not be released to the public until after the end of the year, in order to protect the service members involved, and that he was unaware of any written order by the governor calling up the Guard for drug eradication purposes. Although House could recall instances in which the Guard had been mobilized without a signed proclamation from the governor, none were part of a law enforcement operation.

Boyster testified that two Guard helicopters were flying no more than one hundred feet above his property and that one landed on adjacent property. The first

---

[3] A bush hog is a large rotary cutter that is pulled behind a tractor to mow land and to cut trails.

individuals who came to his residence were in army fatigues he said, and local law enforcement arrived some 30 - 45 minutes later. He admitted that he gave the government agents permission to "look around" and that he signed a consent to search form, but he claimed that he only signed it after being told they "weren't after me." He affirmed on cross examination that he had also signed a statement admitting he grew marijuana on his land, but he denied knowing what was in the statement when he signed it.

The district court denied Boyster's motion to suppress after hearing testimony and receiving various exhibits, including a video of the aerial surveillance. The court determined that 32 U.S.C. § 112 allows the use of the Guard in drug interdiction if it is pursuant to a state plan and consistent with Arkansas law. The court concluded that Arkansas law gives the governor the authority to utilize the Guard for this purpose and does not require a specific proclamation in each instance in which the Guard is called up by the state. The district court also found that Boyster did not have an expectation of privacy in the land surveyed by the helicopters and that there was probable cause for the DEA and ASP to go to Boyster's residence and continue their investigation once the spotters identified marijuana in the field adjacent to his residence. When the officers who approached his residence on the ground saw that there was marijuana in plain view on his property, there was additional probable cause for the search. Finally, the court found that Boyster's statements to investigators were voluntary and admissible.

Boyster complains that the Guard's participation in the aerial surveillance of his property was unlawful because the governor had not issued a proclamation authorizing participation by the militia as required by Arkansas law. He argues that he had an expectation of privacy in the absence of such a proclamation, that the search therefore violated the Fourth Amendment, and that the evidence obtained as a result must be excluded for that reason and as fruit of the poisonous tree. The United States responds that Arkansas law does not require a written or public gubernatorial

proclamation for the state to use the Guard and that the Fourth Amendment was not implicated by the search because Boyster had no expectation of privacy. We review de novo the district court's legal conclusions on a motion to suppress and its factual findings for clear error. United States v. Williams, 429 F.3d 767, 771 (8th Cir. 2005).

An aerial surveillance by helicopter was held not to violate the Fourth Amendment in Florida v. Riley, 488 U.S. 445(1989), because the defendant had had no reasonable expectation of privacy. The Supreme Court also pointed out that it was of "obvious importance" that the helicopter had been violating no law and that the situation would have been different "if flying at that altitude [400 feet] had been contrary to law or regulation." 488 U.S. at 451. Boyster seeks to distinguish Riley on the basis that the aerial surveillance here was unlawful because it had not been authorized by a proclamation from the governor.

Federal law authorizes funding for the use of the National Guard in drug interdiction efforts, 32 U.S.C. § 112(b)(1), and the Arkansas Constitution authorizes the governor to call up the Guard "in such manner as may be authorized by law." Ark. Const. § 4. The Arkansas legislature has in turn spelled out this authority in several statutory provisions. The governor may call up the Guard for "active service of the state for such a period, to such extent, and in such manner as he may deem necessary" in order to "preserve the public health and security and maintain law and order." A.C.A. § 12-61-111(a)(1) (emphasis added). Whenever any part of the Guard is called to aid civilian authorities,

> the Governor, if in his judgment the maintenance of law and order or preservation of the public health or security will thereby be promoted, may by proclamation declare the county, city, zone, or sector in which the troops are serving, or any specified portion thereof, to be in a state of insurrection or emergency.

A.C.A. § 12-61-115(a) (emphasis added). Boyster concedes that these provisions authorize the governor to call up the Guard for drug interdiction efforts for the benefit of public welfare and security, but he claims that § 12-61-115(a) requires issuance of a proclamation from the governor in every instance in which the Guard aids local law enforcement.

We begin with the plain language of § 12-61-115, and our inquiry ends if the provision is unambiguous. United States v. Maswai, 419 F.3d 822, 824 (8th Cir. 2005); Royal v. Kautzky, 375 F.3d 720, 728-29 (8th Cir. 2004); see also Releford v. Pine Bluff School Dist. No. 3, 140 S.W.3d 483, 485-86 (Ark. 2004). The language of this provision should also be examined in a way to prevent other parts of the Arkansas Code from being meaningless, inconsistent, or superfluous. Cody v. Hillard, 304 F.3d 767, 776 (8th Cir. 2002); see also Locke v. Cook, 434 S.W.2d 598, 601 (Ark. 1968).

Section 12-61-115(a) uses permissive rather than mandatory language. It provides that if the governor "in his judgment" believes the Guard needs to be called up in the interest of protecting health and security, he "may by proclamation" declare a state of insurrection or emergency. It does not say that the governor can only call up the Guard by means of a proclamation or that a proclamation is necessary. Other provisions of the Arkansas Code also support this reading and demonstrate precision in the drafting language. Section 12-61-111(a)(1) provides that the governor can call up the Guard for the same purposes "in such manner as he may deem necessary" and does not indicate that a proclamation is required. Sections 12-61-115(a) and 12-61-111(a)(1) are thus consistent with each other. Section 12-61-115(b) in contrast provides that the "enforcement of the civil laws of the state shall be performed by the militia" if the courts or law enforcement cannot function. (emphasis added). The Arkansas courts have long presumed that when "shall" is used in the state statutes, "the legislature intended mandatory compliance ... unless such an interpretation would lead to absurdity." Fulmer v. State, 987 S.W.2d 700, 703 (1999); Hattison v. State,

-6-

920 S.W.2d 849 (1996); <u>Klinger v. City of Fayetteville</u>, 732 S.W.2d 859 (1987); <u>Loyd v. Knight</u>, 706 S.W.2d 393 (1986). The converse must also be true – that the use of "may" signifies the legislature's intent to establish discretionary authority unless that result would be absurd. <u>See, e.g.</u>, <u>John T. v. Marion Independent School Dist.</u>, 173 F.3d 684, 688 (8th Cir. 1999). We conclude that the statutory scheme leaves the decision whether to issue a proclamation to the discretion of the governor and that the lack of such a proclamation here does not mean that the Guard's involvement in the counterdrug surveillance was unlawful, particularly when the governor has specifically certified that the counterdrug plan complies with state law.

Boyster also complains that the aerial surveillance infringed upon his privacy rights in violation of the Fourth Amendment. The government responds that there is no constitutional issue here because the initial discovery of marijuana was outside the curtilage of Boyster's residence in an unprotected open field and that any expectation of privacy would be unreasonable under the circumstances even if the land had been in his curtilage. Boyster disputes this claim, referring to a statement in DEA Agent Hydron's investigative report that the seized marijuana had been located "in an area of and on the curtilage of" Boyster's residence. Boyster bears the burden to prove that he had a legitimate expectation of privacy in the thing being searched or surveyed. <u>United States v. Pinson</u>, 24 F.3d 1056, 1058 (8th Cir. 1994); <u>see also</u> <u>Riley</u>, 488 U.S. at 455 (O'Connor, J., concurring).

The Fourth Amendment protects the curtilage of an individual's residence, but not surrounding open fields. <u>See</u> <u>Hester v. United States</u>, 265 U.S. 57, 59 (1924). Curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life," <u>Oliver v. United States</u>, 466 U.S. 170, 180 (1984) (internal citations omitted), and is typically comprised of land adjoining a house, often within some type of enclosure such as a fence. <u>See</u> <u>Black's Law Dictionary</u> 411 (8th ed. 1999); <u>see</u> <u>also</u> <u>United States v. Gerard</u>, 362 F.3d 484, 487-88 (8th Cir. 2004) (presence of a fence between the primary residence and

another area typically means that area is outside the curtilage).  Determining whether a particular area is part of the curtilage of an individual's residence requires consideration of "factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." United States v. Dunn, 480 U.S. 294, 300 (1987); see also Oliver, 466 U.S. at 180.  Although every curtilage determination grows out of its own set of facts, Gerard, 362 F.3d at 487, four factors are particularly significant: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  Dunn, 480 U.S. at 301; see also Gerard, 362 F.3d at 487; United States v. Mooring, 137 F.3d 595, 596 (8th Cir. 1998).

After reviewing the record, we conclude that the district court did not err by determining that the aerial surveillance had not occurred within the curtilage of Boyster's residence.  The statement by agent Hydron that marijuana was located on the curtilage of his property is only one of the facts in the record, and we must examine their totality in light of Dunn.  The observed field was located over 100 yards from the residence, and it was not enclosed by a fence.  It does not appear that Boyster took any ordinary precautions to keep the marijuana from being visible to onlookers, and nothing in the record indicates that the land was used for any legitimate purpose associated with a residence.  The land in question is more properly considered an unprotected open field with marijuana plants in plain view. Hester, 265 U.S. at 58-59; see also United States v. Pennington, 287 F.3d 739, 745 (8th Cir. 2002) (field outside the curtilage of defendant's residence was an open field that could be entered without a warrant and everything in plain view could be searched).

Even if the land in question were within the curtilage, Boyster would still have to demonstrate that he maintained a legitimate expectation of privacy which was infringed by the aerial surveillance.  An expectation of privacy is only legitimate if the

individual challenging the search had manifested a subjective expectation of privacy in the thing searched and demonstrated that his belief is objectively reasonable. Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). We assume without deciding that Boyster had a subjective expectation of privacy and focus on whether such an expectation could be objectively reasonable. So long as the aerial surveillance took place in an area where the public could legally fly and at an altitude generally used by the public, there would be no reasonable expectation of privacy and thus no offense to the Fourth Amendment. Riley, 488 U.S. at 455 (O'Connor, J., concurring); see also United States v. Clark, 980 F.2d 11431146 (8th Cir. 1992); United States v. Hendrickson, 940 F.2d 320, 323 (8th Cir. 1991).

Boyster has made no allegation that the Guard pilots offended any federal aviation regulation, and under existing federal law "[a]ny member of the public could legally have been flying over [Boyster's] property in a helicopter" and could have observed the marijuana plants growing in the open field. Riley, 488 U.S. at 451; see also 14 C.F.R. § 91.119 (helicopters may be operated below the minimums set for aircraft if done without hazard to persons or property below). Boyster has failed to establish the altitude of the flight in question, and even if it were at an altitude of around one hundred feet as he alleges, he has not shown that flights at this altitude are so rare as to make aerial surveillance at that level unreasonable. Riley, 488 U.S. at 455 (O'Connor, J., concurring).

We conclude that Boyster's asserted expectation of privacy is not one "that society is prepared to accept" as reasonable. California v. Ciraolo, 476 U.S. 207, 214 (1984) (finding that defendant's expectation that his garden was protected from lawful aerial surveillance by law enforcement was unreasonable); Riley, 488 U.S. at 451-52 (upholding the aerial surveillance of greenhouse by law enforcement flying at an altitude of 400 feet since there was no reasonable expectation of privacy). The aerial surveillance in this case did not violate the Fourth Amendment.

For these reasons we affirm the judgment of the district court.

_____