# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2698

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Deandra Sue Warford, | * |
| | * |
| Appellant. | * |

_____

No. 05-2859

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Phillip Whatley, | * |
| | * |
| Appellant. | * |

Appeals from the United States
District Court for the
Western District of Arkansas.

_____

Submitted: December 13, 2005
Filed: March 6, 2006

_____

Before MELLOY, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Deandra Sue Warford and Phillip Whatley entered conditional guilty pleas to manufacturing more than 100 marijuana plants, in violation of 21 U.S.C. § 841(a)(1). They reserved the right to appeal the district court's denial of their motions to suppress evidence discovered in a search of their house and surrounding areas. The district court[1] determined that the limitation on statutory minimum sentences of USSG § 5C1.2 should not apply to Whatley and sentenced him to the mandatory minimum term of 60 months' imprisonment. Warford was sentenced to 24 months' imprisonment. Whatley and Warford appeal the denial of the motion to suppress, and Whatley appeals his sentence. We affirm.

I.

On August 18, 2004, Special Agents Ken Willock and Lori Lawson of the Arkansas State Police applied for and obtained a search warrant for property located at Route 5, Box 321, on Madison County Road 8030, where Warford and Whatley resided. The warrant authorized the police to search for "[m]arijuana, other illegal drugs, any items used in the manufacture and consumption of marijuana and other illegal drugs, [and] . . . any firearms, or money, which is being possessed illegally." (Appellee's Add. at 1, 6). The warrant was based on information provided by Millicent Morgan, who is a daughter of Warford and Whatley, and Millicent's husband, Jessie Morgan.

According to the affidavit, Millicent Morgan called Agent Willock on July 29, 2004, and stated that her father, Phillip Whatley, was involved in manufacturing and delivering marijuana and was a convicted felon in possession of firearms. Millicent

---

[1]The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

stated that her father transported a large bag of marijuana to his son in Mississippi in 2003, and that, as a child, she helped her father sprout, plant, and water seeds at his home. On August 9, 2004, Agent Lawson met with Millicent, who also disclosed a history of alleged sexual abuse by her father. Agent Lawson investigated the account by researching Department of Human Services ("DHS") records, which substantiated the reported neglect and abuse, and by speaking to Millicent's maternal grandfather, who verified her story.

On August 10, 2004, Agent Willock met with Millicent and Jessie near Rogers, Arkansas. Jessie told Willock that on March 15, 2004, while he and Whatley were meeting at a motel in Springdale, Arkansas, Whatley showed him a black metal Smith and Wesson 9 millimeter semiautomatic handgun. Whatley then asked if Jessie had a weapon that he carried with him for protection. When Jessie replied in the negative, Whatley gave him a Smith and Wesson .40 caliber semiautomatic handgun, which Jessie showed the officer. Both Jessie and Millicent said that Whatley and Warford carried the 9 millimeter handgun in their two-year-old son's diaper bag, and Millicent stated that her father always has a gun with or near him.

According to the affidavit, on August 11, Jessie and Whatley were meeting in another motel room near Rogers, Arkansas, and Whatley told Jessie that he had an SKS assault rifle at his home. Jessie then asked to clean the 9 millimeter handgun. Whatley agreed, retrieved the gun from a diaper bag, allowed Jessie to clean it, and returned it to the bag. Agent Lawson met with Millicent and Jessie on August 12, and Millicent stated that her parents have a long history of scamming stores out of money, and that her father "never goes anywhere without a gun." (Appellee's Add. at 3). While acknowledging that she had not visited Whatley's property for seven years, Millicent told the agent that she believed Whatley was growing marijuana on the property, because she and Jessie had asked to visit, but her parents continually said the property is "not ready for company." She also said that her father had plenty of money, despite never holding a regular job.

On August 14, the affidavit states, Millicent told Agent Lawson that she had checked the diaper bag and the gun was still there. She also expressed concern that her younger sisters, who still lived with Warford and Whatley, were in danger of being sexually abused. Agent Lawson also discovered an outstanding warrant for Warford for a misdemeanor shoplifting charge, and noted that her criminal history included several prior arrests for theft. Whatley is a convicted felon with prior convictions for a violation of the Arkansas Hot Check Law, marijuana manufacturing, and possession of firearms.

Prior to obtaining the warrant, Agent Willock learned from Sergeant Robert York of the Arkansas State Police that on August 19, the marijuana eradication program, operated jointly with the Drug Enforcement Agency ("DEA"), would be doing a helicopter flyover of the county in which Whatley's property is located. Agent Willock obtained the warrant on August 18, and Sergeant York agreed to support Agent Willock's execution of the warrant with one aircraft and ground crew.

Agents executed the search warrant on the morning of August 19, 2004. The helicopter was making its way towards the Whatley property as the officers approached the residence. As the officers began a protective sweep of the residence, Agent Willock received word from Sergeant York in the helicopter that the eradication team had observed marijuana growing on the property. Agent Willock went outside to take photographs of plots around the property, while Sergeant York directed the officers on the ground to the marijuana plants. Assisted by Sergeant York's observation from the helicopter, the officers were able to locate and seize 482 marijuana plants growing in two heavily wooded areas approximately 100 to 150 yards from the house, and in a ditch beside the driveway approximately 30 yards from the residence.

Inside the residence, the officers discovered processed marijuana, marijuana seeds, and drug paraphernalia throughout the house. They also found an M-48A high

caliber rifle, a .22 caliber rifle loaded with three rounds, and part of a non-working rifle behind the front door.

Based on this evidence, a grand jury charged Warford and Whatley with conspiring to manufacture marijuana and manufacturing more than 100 marijuana plants. Whatley also was charged with three counts of unlawful possession of a firearm as a convicted felon. The defendants moved to suppress the evidence seized during the search, and, after the district court denied their motions, each entered a conditional guilty plea to one count of manufacturing marijuana.

In denying the motion to suppress, the district court found that the officers adequately corroborated Millicent's identity as the defendant's child by researching DHS records and speaking to Millicent's grandfather, and that, because she was not an anonymous informant, the requirement of further verification of her "bona fides" did not apply. (Whatley Tr. at 70-71). The court reasoned that because Millicent was the daughter of Warford and Whatley, and provided information that they were still living at her childhood home, it was reasonable for the court to believe that Warford and Whatley in fact lived there. The court also concluded that because Whatley carried guns and showed them to his son-in-law, there was probable cause to believe he had guns at his home. The court ruled that even if the warrant was defective, in light of the "possible violations of the law with respect to drugs, possible weapons violations by Mr. Whatley, and perhaps violations of the rights of children," the officers executing the warrant had a good faith belief in its validity. (Whatley Tr. at 73-74). In the alternative, the court found that the evidence inevitably would have been discovered, because Sergeant York would have flown over the property even if Agent Willock had not obtained a warrant, and Sergeant York would have sought a warrant based on his observation of the marijuana plants.

## II.

Warford and Whatley argue that there was not probable cause for the magistrate to issue the warrant, because the officers did not adequately corroborate the information provided by the Morgans, and because the information pertaining to the alleged marijuana growing operation was stale. Where a search is conducted pursuant to a warrant, the good faith exception to the exclusionary rule applies, and evidence should not be suppressed due to an absence of probable cause unless the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984).

In reviewing a district court's denial of a motion to suppress, we may consider the applicability of the good-faith exception to the exclusionary rule before reviewing the existence of probable cause. If the officers acted in good-faith reliance on a warrant, then there is no need to visit the underlying question of probable cause. *United States v. Chambers*, 987 F.2d 1331, 1334 (8th Cir. 1993). We review the court's factual determinations for clear error and its legal conclusions *de novo*. *United States v. Lynch*, 322 F.3d 1016, 1017 (8th Cir. 2003).

Probable cause exists when the affidavit sets forth sufficient facts to lead a prudent person to believe that there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When an informant provides the information used to obtain the warrant, the "core question in assessing probable cause . . . is whether the information is reliable." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). Even where an informant does not have a track record of supplying reliable evidence, the information may be considered reliable if it is corroborated by independent evidence. *Id.; United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994).

The investigation in this case was sufficient to make objectively reasonable the officers' reliance on the warrant issued by the neutral magistrate. The affidavit was not based on an anonymous tip. Agent Willock met face-to-face with the Morgans and determined that Jessie and Millicent appeared credible. (Tr. at 38-39); *United States v. Wilson*, 964 F.2d 807, 810 (8th Cir. 1992); *see also Robertson*, 39 F.3d at 893 (first-hand observation of an informant in a personal meeting gives greater weight to an officer's decision to rely on that information). The couple gave detailed and specific descriptions of several incidents in which they observed Whatley in possession of firearms and provided dates and context for the allegations. "[T]here is an inherent indicia of reliability in the richness and detail of a first hand observation." *Robertson*, 39 F.3d at 893 (internal quotation omitted). Although Millicent's credibility might be impeached in light of her estrangement from her father, "even if we entertain some doubt as to an informant's motives, [her] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [her] tip to greater weight than might otherwise be the case." *Gates*, 462 U.S. at 234.

The police also independently verified many aspects of the Morgans' information, and although a number of these details did not pertain directly to the alleged criminal activity under investigation, the verification enhanced the general credibility of the sources, and supports the reasonableness of official reliance on a warrant obtained based on information provided by the Morgans. Agent Lawson verified Millicent's allegations of abuse by contacting DHS, which had four referral records on the Whatley family from 1985 through 2001. Agent Lawson also interviewed Millicent's maternal grandfather, who confirmed Millicent's identity and statement. Lawson verified that Whatley is a convicted felon, with convictions for manufacturing marijuana and possession of firearms. Crime information center records on Warford revealed that she had an outstanding warrant for a previous shoplifting charge, corroborating Millicent's claim that her parents have "a long

history of scamming Wal-Mart and other stores out of money for the past several years." (Appellee's Add. at 3).

With respect to the firearm allegations, Warford argues that the facts contained in the warrant, even if true, indicate only that Whatley possessed a gun on two isolated incidents away from his residence, and do not provide probable cause to believe that Whatley constructively possessed any firearm at his residence. The affidavit specifically states, however, that Jessie reported Whatley's admission that he kept an SKS assault rifle at his residence. Beyond that, it was reasonable for the officers to rely on the magistrate's apparent conclusion that there was probable cause to believe that Whatley kept at his residence other firearms that he was known to carry with him. *See United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975). We thus conclude that it was objectively reasonable for the officers to rely on the issuance of a warrant to search for firearms at the Whatley/Warford residence.

Warford and Whatley also contend that no reasonable officer could have relied on the authority of the warrant to search the home for marijuana, because the information in the affidavit concerning unlawful drug activity was stale. It is true that Millicent's information concerning manufacture of marijuana at the residence was based on observations seven years earlier. But Millicent did provide more recent evidence of drug trafficking, stating that in 2003, her father transported a large bag of marijuana to her brother in Mississippi.

In light of our conclusion that the officers could rely in good faith on the warrant to search the residence for firearms, we need not decide whether the officers also could rely on the warrant to search for marijuana and drug paraphernalia. A search warrant that properly authorizes a search for certain items, but is invalid as to other items, does not require suppression of all evidence seized pursuant to the warrant. Rather, evidence is admissible if it is seized pursuant to the portions of the warrant relied upon in good faith, or if it is discovered in plain view while executing

the valid portions of the warrant. *United States v. Fitzgerald*, 724 F.2d 633, 636-37 (8th Cir. 1983) (en banc). The government presented evidence that all items of marijuana or drug paraphernalia were in plain view or in areas where guns could be found, (Whatley Tr. at 21), and Whatley and Warford do not contest this fact. Accordingly, whether or not the officers could rely in good faith on the warrant to search for drugs, the marijuana and paraphernalia found in the house were admissible as evidence seized in good faith reliance on a warrant to search for firearms.

Warford next argues that the marijuana plants seized outside the house should have been suppressed. He contends that they were seized as a result of the aerial observation by Sergeant York, and that because the helicopter was operating below normal cruising altitude in a manner not permissible for the general public, York's observations constituted a search for which a warrant was required. York testified that the helicopter's typical cruising altitude for spotting marijuana is 500 feet, but that investigators sometimes fly lower – in this case, down to 200 or 300 feet – to confirm a marijuana sighting. (Tr. at 46-47, 49). The parties dispute whether the plants observed were within the curtilage of the home or on land akin to "open fields." *See Oliver v. United States*, 466 U.S. 170, 180 (1984).

Aerial surveillance of even the curtilage of a home from publicly navigable airspace, at an altitude generally used by the public and conducted with the naked eye, is not a "search" within the meaning of the Fourth Amendment, because there is no reasonable expectation of privacy in areas visible to the public. *California v. Ciraolo*, 476 U.S. 207, 213-15 (1986); *United States v. Boyster*, No. 05-1690, 2006 WL 305516, at *5 (8th Cir. Feb. 10, 2006). As Warford concedes, Federal Aviation Administration regulations permit fixed-wing-aircraft to be operated at an altitude of 500 feet above the surface in areas that are not congested, while helicopters may be operated at less than 500 feet "if the operation is conducted without hazard to persons or property on the surface." 14 C.F.R. § 91.119 (2005). Helicopters are not "bound by the lower limits of the navigable airspace allowed to other aircraft," and the

Supreme Court has found no "search" in a helicopter overflight at 400 feet, where such flyovers were not shown to be rare, and any member of the public could legally have flown over the property at that altitude and observed the curtilage. *Florida v. Riley*, 488 U.S. 445, 451 (1989) (plurality opinion); *id.* at 455 (O'Connor, J., concurring in judgment).

While the police dropped to an altitude of 200 or 300 hundred feet to observe Whatley's property, this altitude would have been legally permissible for any member of the public, *see* 14 C.F.R. § 91.119(d), and there is no evidence that the helicopter interfered with the respondent's normal use of the curtilage, observed any intimate details connected with the use of the home or curtilage, or created undue noise, wind, dust, or threat of injury, *Riley*, 488 U.S. at 452, or that such flights are so rare as to violate a reasonable expectation of privacy. *Id.* at 455 (O'Connor, J., concurring in judgment); *Boyster*, 2006 WL 305516, at *5 (warrantless aerial surveillance of the curtilage at an altitude of 100 feet upheld where the defendant made no showing that such helicopter flights are "so rare as to make aerial surveillance at that level unreasonable"). In these circumstances, there was no search, and the police were not required to obtain a warrant to conduct a helicopter flyover of the property.

The helicopter flyover also supports the district court's alternative holding that the evidence seized on Whatley's property was admissible under the inevitable discovery doctrine. Even under our court's present narrow view of that doctrine, *see United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997); *but see, e.g.*, *United States v. Larsen*, 127 F.3d 984, 986-87 (10th Cir. 1997), the aerial surveillance was a substantial, alternative line of investigation already initiated through the DEA's marijuana eradication program. The district court found, based on testimony at the suppression hearing, that Sergeant York's team would have discovered the marijuana growing outside Whatley's residence regardless whether the warrant had been issued (*see* Whatley Tr. at 45, 21), and that the aerial observations inevitably would have led to the issuance of a warrant to search the inside of the home for marijuana. (Whatley

Tr. at 45-46). These findings are not clearly erroneous. Therefore, all the evidence seized in the challenged search would inevitably have been discovered by law enforcement, even if reliance on the warrant was not objectively reasonable. *See United States v. Dickson*, 64 F.3d 409, 411 (8th Cir. 1995). For all of these reasons, we affirm the district court's denial of the defendants' motion to suppress.

## III.

With respect to his sentence, Whatley argues that the district court erred in not applying the limitation on statutory minimum sentences, pursuant to USSG § 5C1.2, to impose a term of imprisonment of fewer than 60 months. Under this so-called "safety-valve" provision, a defendant convicted of manufacturing a controlled substance may be sentenced without regard to the statutory minimum sentence if, among other conditions, the "defendant did not . . . possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense." USSG § 5C1.2(2). Whatley contends that there was insufficient evidence to show that he possessed firearms "in connection with" his manufacture of marijuana. The defendant bears the burden of showing that he meets each condition of the safety-valve provision, and we review the district court's findings for clear error. *United States v. Carrillo*, 380 F.3d 411, 415 (8th Cir. 2004).

A defendant possesses a firearm "in connection with" an offense if the evidence shows that the weapon "facilitated or had [the] potential to facilitate" the drug offense. *United States v. Burke*, 91 F.3d 1052, 1053 (8th Cir. 1996) (per curiam). The presence of a firearm in a location where it could be used to protect drugs can be sufficient evidence to prove the requisite connection. *Id.*

Applying that legal standard, we conclude that the district court did not clearly err by finding on this record that Whatley failed to meet his burden. The police found two working firearms, one of which was loaded, behind the front door of the Whatley

residence. The officers also found marijuana seeds, processed marijuana, and drug paraphernalia throughout the house. The discovery included a five-gallon bucket of marijuana seeds located just inside the door. At Whatley's sentencing hearing, the district court found that Whatley's son and wife purchased the firearms at the behest of Mr. Whatley and for his use. A law enforcement agent testified that he spoke with Whatley's son, who informed the agent that Whatley said there were holes in a pump house on the property "so he could shoot at police if they raided his property." (Whatley Tr. at 130). This evidence provided a sufficient basis to conclude that Whatley possessed the firearms so they could be used to protect his drug manufacturing operation, and we thus discern no clear error in the district court's refusal to apply the safety-valve provision.

Whatley also argues that mandatory minimum sentences are "constitutionally suspect" in light of *United States v. Booker*, 543 U.S. 220 (2005), and, in addition, that the district court erred by enhancing his sentence based on judge-found determinations about the existence and nature of his prior conviction. *Booker*, however, does not render unconstitutional a statutory minimum sentence, *United States v. Rojas-Coria*, 401 F.3d 871, 874 n.4 (8th Cir. 2005), and the Sixth Amendment does not prevent a district court from making findings about the fact and nature of a defendant's prior convictions. *United States v. Patterson*, 412 F.3d 1011, 1015-16 (8th Cir. 2005).

\*          \*          \*

The judgments of the district court are affirmed.

_____