# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-2638

MIREILLE TCHEMKOU,

*Petitioner*,

v.

ALBERTO R. GONZALES,

*Respondent*.

———————

Petition for Review of an Order
of the Board of Immigration Appeals
No. A79 573 118

———————

ARGUED JUNE 4, 2007—DECIDED JULY 31, 2007

———————

Before RIPPLE, ROVNER and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Mireille Tchemkou, a native and citizen of Cameroon, arrived in the United States on a visitor's visa and timely applied for asylum. An Immigration Judge ("IJ") denied her request, and the Board of Immigration Appeals ("BIA") affirmed that denial. Ms. Tchemkou timely petitioned for review in this court. We now grant the petition.

# I

# BACKGROUND

## A. Facts

Ms. Tchemkou is a native of Cameroon and a member of the ethnic minority Bamileke tribe. Her troubles with the Cameroonian government began in 1993 during her senior year in high school. At that time, she was involved in the United Nations Education, Science and Culture Organization ("UNESCO") at Mbanga High School. In April and May of 1993, the teachers at Mbanga High School went on strike because they, unlike teachers in non-Bamileke regions, had not been paid for several months. Because of the teachers' absence, the Mbanga students were not able to prepare for a national examination required for admittance to Cameroon's universities. Ms. Tchemkou helped organize a protest to end the strike; specifically, the students, together with parents and teachers, planned to march from the high school to the regional leader's office.

On the day of the march, the police intercepted the students. Their presence frightened away most of the students with the exception of the six UNESCO board members. The police confronted Ms. Tchemkou and, according to Ms. Tchemkou's testimony, stated:

> Do you think that you can change the government, do you think that these activities that you are, these activities that you have will end up somewhere? You should just shut up if you want to lead a quiet life in this country. We do not want people like you creating chaos and giving us so much work. If you want to stay alive you must keep away from these kind of activities which you have now started.

A.R.99. The police then began beating Ms. Tchemkou and the other students with batons; Ms. Tchemkou was struck in the jaw, loosening several teeth. The students then were forced into a police truck and taken to the police station where the beatings continued.

At the station, the police interrogated Ms. Tchemkou, threatened her life and told her that they would teach her a lesson for speaking out against the government. A.R.558. The police detained Ms. Tchemkou in a cell with numerous other prisoners. During her three-day incarceration, she had nothing to eat or to drink, and the cell in which she was placed did not have sanitation facilities. Because the cell was crowded and did not contain any benches or other furniture, Ms. Tchemkou was forced to stand throughout the duration of her detention. Additionally, because she was the only female in the cell, she was forced to clean the male prisoners' excrement off the floor.

Upon Ms. Tchemkou's release, she required a two-week hospital stay to recover from severe dehydration, fever, stomach pain and other physical injuries.[1] After Ms. Tchemkou's hospitalization, her parents feared for her safety and sent her to the neighboring country of Benin. She stayed in Benin for two and one-half years. During that time, she received psychological counseling to overcome depression. Ms. Tchemkou returned to Cameroon in December 1996 against her parents' wishes. Although she returned, she kept to her parents' home for another year.

In January 1998, Ms. Tchemkou began attending the University of Dschang. There, she became friendly with

---

[1] During her stay in prison, she also contracted a chronic fungal nail infection that still afflicts her today.

several members of the Social Democratic Front ("SDF"), the primary political opposition organization in Cameroon. Ms. Tchemkou learned that her uncle, an SDF official, was hosting a party in a nearby town. Ms. Tchemkou traveled to the party with several members of the SDF in a bus decorated with SDF banners. On the return trip, the police stopped the bus, demanded the students' identity papers and took down their names. The police asked Ms. Tchemkou whether she had "come [to the university] to study or do politics?" A.R.105.

In May 1998, Ms. Tchemkou learned that the university was closing its psychology department. According to Ms. Tchemkou, the government believed that the professors and students in the department were sympathetic to opposition groups. *See* A.R.108-09, 559. Ms. Tchemkou met with other psychology students to discuss ways to prevent the department's closure. Shortly after the meeting began, police, armed with guns and batons, raided the meeting. They told the students to disband and to leave any papers behind, including the attendance sheet the students had signed.

Later that night, as Ms. Tchemkou prepared for bed, she heard pounding and shouting at her apartment door. When she answered, three men wearing Cameroonian military uniforms forced their way into the apartment and turned out the lights. They immediately started questioning Ms. Tchemkou. After Ms. Tchemkou identified herself in response to their queries, "[t]hey said so yes indeed you are the person we are looking for." A.R.110. They accused Ms. Tchemkou of being a "Bamileke" and "against the government." *Id.* Ms. Tchemkou then was gagged, blindfolded, forced into the abductors' car and driven away from her apartment. After the car stopped, the

soldiers dragged her through a wooded area, beat her and kicked her; as a result, she suffered scarring on her arms and shins. One of her abductors tore part of Ms. Tchemkou's left ear and told her not to return to campus. A.R.560. The soldiers then threw Ms. Tchemkou back in the car where she fainted from pain.

When Ms. Tchemkou regained consciousness, she was in a hospital where she remained for 24 days. During this time she was treated for a serious cut to her left earlobe as well as muscle aches. A.R.331. After her release, she returned to her parents' home and continued to receive physical therapy and psychological treatment.

Ms. Tchemkou did not return to school for over a year. In October 2000, she began attending the British College of Professional Management in Douala. In January 2001, local police in Douala arrested nine males for allegedly stealing a neighbor's cooking gas. It was feared that the teens had been executed, and Ms. Tchemkou coordinated with several political groups to try to determine what had happened to these young men. Together these groups organized peaceful demonstrations to pressure the government to disclose this information. The first demonstration was on March 4, 2001. When the protestors arrived, security officers already were on the scene and began attacking the crowd. Ms. Tchemkou suffered a baton blow to the head as police dispersed the protestors.

A second protest was scheduled for March 11, 2001. Again the police intervened, this time using tear gas and using water canons laced with chemicals to disperse the crowd. Police also beat the protestors with batons. Ms. Tchemkou was knocked to the ground; she was kicked and beaten with a baton on her back, elbows and shins. Ms. Tchemkou saw that the police were arresting some of the

protestors and fled to a nearby church for sanctuary. The pastor of the church, after hearing of the police tactics, advised Ms. Tchemkou to stay at the church under his protection to assure her safety. Ms. Tchemkou remained at the church for two weeks while the pastor worked with Ms. Tchemkou's family to obtain an exit visa. The pastor also arranged for financing for Ms. Tchemkou's airfare and used his status as a clergyman to escort her through the airport without government involvement.

After Ms. Tchemkou arrived in the United States on April 9, 2001, the Cameroonian government issued two summonses for her to appear before the authorities.

## B. Administrative Proceedings

A few months after Ms. Tchemkou had arrived in the United States, she applied for asylum. The asylum officer denied her request, and she was served with a notice to appear.

Before the IJ, Ms. Tchemkou conceded deportability but renewed her request for asylum, withholding of deportation and relief under the Convention Against Torture ("CAT"). At the hearing, Ms. Tchemkou testified to the above events.[2] The IJ found that Ms. Tchemkou was

---

[2] In addition to her oral testimony, Ms. Tchemkou provided the IJ with documentation concerning her hospitalizations, her recent health examinations and Cameroon's poor human rights record. The record also contains a letter from Ms. Tchemkou's uncle and SDF parliamentarian, Paul Tchatchouang, stating that, because Ms. Tchemkou previously had opposed the Cameroonian government, she continued to face a serious risk of abuse

(continued...)

"genuinely credible," A.R.55, but nevertheless determined that Ms. Tchemkou had not established past persecution. The IJ first stated that the mistreatment suffered by Ms. Tchemkou in 1993, 1998 and 2001 "were disparate offense[s] in which the most serious mistreatment that she experienced was a cut to her earlobe." A.R.53.[3] The IJ continued:

> I don't think these are comparable to which the Seventh Circuit[4] has found past persecution. The incidents, although united by detention and beating in two of the three cases, and by government security forces either administering the beating or arresting the respondent or pursuing her, do share that theme. However, otherwise, they're very different. Namely they involve different places, respondent being involved in different activities. This is not a case for example, where the respondent's activity, the same

---

[2] (...continued)
and death should she return to Cameroon. He also noted that many of the students with whom Ms. Tchemkou had associated in the past had died after her departure and that the government of Cameroon would do its best to destroy anyone who had opposed it. A.R.248-53.

[3] The IJ's characterization of the first incident was equally benign: "One of the incidents occurred when the respondent was very young and in the equivalent of high school. She had to do some unpleasant duty cleaning toilets. However distasteful, I don't think this constitutes persecution." A.R.53.

[4] The cases cited by the IJ as examples of this court's jurisprudence on persecution were *Asani v. INS*, 154 F.3d 719 (7th Cir. 1998), *Vaduva v. INS*, 131 F.3d 689 (7th Cir. 1997), and *Dandan v. Ashcroft*, 339 F.3d 567 (7th Cir. 2003). *See* A.R.52.

activity participated encounters with government forces each time.

*Id.*

Additionally, the IJ determined that Ms. Tchemkou was not likely to suffer persecution upon her return to Cameroon:

I think that, given the sporadic and varied nature of the incidents separated one from another time and the rather mild encounter that the respondent had, [in] 2001, which was the last incident and the incident on which she claimed she based her decision to depart Cameroon, I am just not convinced that there is an objective basis for her fear of returning to that country now. . . .

*Id.* at 55. Having determined that Ms. Tchemkou did not meet her burden for asylum, the IJ also denied her withholding of removal. Finally, he did not "think that the mistreatment that she suffered rises to the level [of] torture," and the type of treatment she endured did not "portend[] future mistreatment [that] would meet the definition of Section 1 of the Convention Against Torture. Therefore, Torture Convention relief is denied." *Id.* at 56.

The BIA affirmed. The Board stated that "we find the record adequately supports the Immigration Judge's finding that the respondent's 'genuinely credible' testimony failed to establish past persecution or a well-founded fear or clear probability of future persecution or torture in Cameroon." A.R.2 (citing *Liu v. Ashcroft*, 380 F.3d 307, 313-14 (7th Cir. 2004)). The Board also noted that "the record does not sufficiently show that the government remains interested in the respondent. Despite having 6 police summons on record dating from November 2000,

the respondent was able to continue her education, and obtain an exist [sic] visa and use her passport to leave Cameroon without any problems." *Id.*

Ms. Tchemkou timely petitioned for review of the BIA's decision.

## II

## ANALYSIS

### A.

Ms. Tchemkou first maintains that the BIA erred when it determined that she had not suffered past persecution. Where, as here, the BIA adopts the IJ's decision and also supplements the IJ's decision with its own reasoning, the IJ's decision, as supplemented, forms the basis for this court's review. *See Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006). We review the agency's legal analysis de novo. *See Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003). However, our review of the agency's denial of asylum is deferential: "[W]e require only that the decision be supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Gjerazi*, 435 F.3d at 807 (internal quotation marks and citations omitted). We shall reverse an agency's determination only if the record compels a contrary result. *Bevc v. INS*, 47 F.3d 907, 910 (7th Cir. 1995).

In the present case, we believe that the IJ and the BIA committed legal error with respect to the standard applied to Ms. Tchemkou's claim and also that the agency's factual conclusions find no support in the record. As noted in our recitation of the standard of review, the agency is obligated to consider the evidence of record "as a whole."

*Gjerazi*, 435 F.3d at 807. This court, as well as other courts of appeals, have cautioned IJs against viewing events in the record "in isolation, rather than considering what kind of patterns they composed," *Kantoni v. Gonzales,* 461 F.3d 894, 898 (7th Cir. 2006) (collecting cases), and against employing the "erroneous" "technique of addressing the severity of each event in isolation, without considering its cumulative significance," *Poradisova v. Gonzales*, 420 F.3d 70, 79 (2d Cir. 2005). Yet, compartmentalization of this evidence is precisely the approach taken by the IJ. The IJ viewed the incidents as "sporadic and varied [in] nature," as well as "separated one from another." A.R.55.

The BIA did not correct this error in its opinion. However, perhaps wary of the approach taken by the IJ, the Board notes that "[e]ven when analyzed in the aggregate . . . the incidents of which the respondent complained do not reveal harm that rises to the level of persecution." A.R.2. The BIA relies on *Liu v. Ashcroft*, 380 F.3d 307, 313-14 (7th Cir. 2004), to support this conclusion. We disagree that *Liu* provides any support for the conclusion that Ms. Tchemkou has not suffered past persecution.

In *Liu*, the petitioner was detained for two days while the police interrogated her about her sale of unauthorized literature. The petitioner was not beaten, nor was she deprived of food and water. However, on two occasions during her detention, police pulled her hair in an effort to make her confess to the crimes. One month after her release, the police ransacked her home to teach her a lesson. In reviewing these incidents, we stated:

> Here, Mei Dan's detainment was relatively short. As physical brutality goes, hair-pulling and pushing rank on the less serious end. The search and ransack was a singular event and it is unclear if the officials caused

> any serious, permanent damage to her home. Taken as a whole, it was not improper for the BIA to determine that these and the other incidents of which Mei Dan complained are more akin to abusive or harassing treatment than persecution.

*Id.* at 313.

The atrocities suffered by Ms. Tchemkou in Cameroon bear no resemblance to the comparatively minor abuses suffered by the petitioner in *Liu*. Unlike the petitioner in *Liu*, Ms. Tchemkou was detained under terrible conditions: She was deprived of food, water and sanitation facilities and was forced to clean human waste off the floor of the cell—a crowded cell in which she was the only woman. Prior to her detention, she had been beaten by police, and, after her release, she required two weeks of hospitalization to recover from the ordeal.

If this were the sum of the abuses suffered by Ms. Tchemkou, it would be sufficient to establish past persecution; however, there is more. Ms. Tchemkou was interrogated by police and abducted from her apartment in 1998; she was dragged through the woods, beaten, kicked and had her earlobe severed. Her hospitalization following this incident lasted twenty-four days. This ordeal was not Ms. Tchemkou's last run-in with Cameroonian police. Following a peaceful demonstration in 2001, Ms. Tchemkou again was beaten with a baton and chased away by police. She was able to escape detention only by seeking sanctuary in a church.

This court has defined persecution as " 'punishment' or 'the infliction of harm' which is administered on account of . . . race, religion, nationality, group membership, or political opinion . . . ." *Asani v. INS*, 154 F.3d 719, 723 (7th

Cir. 1998) (quoting *Borca v. INS*, 77 F.3d 210, 214 (7th Cir. 1996)). "Although the conduct in question need not necessarily threaten the petitioner's 'life or freedom,' it must rise above the level of mere 'harassment' to constitute persecution." *Borca*, 77 F.3d at 214 (citations omitted). The record before us conclusively demonstrates that Ms. Tchemkou suffered something much greater than mere harassment at the hands of the Cameroonian government; indeed, she endured serious bodily harm on two occasions, she was threatened with additional retaliation, and she had her freedom curtailed. These mirror the types of abuses that we previously have held to constitute persecution. *See, e.g., Gomes v. Gonzales*, 473 F.3d 746, 754 (7th Cir. 2007) (reversing agency finding of no persecution where petitioner had been beaten, had his home invaded and had been threatened, and noting that "[t]here is no requirement . . . that a person must endure repeated beatings and physical torment in order to establish past persecution"); *Soumahoro v. Gonzales*, 415 F.3d 732, 737 (7th Cir. 2005) (holding that imprisonment for two weeks, during which time petitioner was beaten, denied adequate food and water, and had salt rubbed in his wounds, constituted past persecution); *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997) (noting that "the Board reasonably concluded Vaduva . . . suffered at least one instance of political persecution" when "he was beaten up (he was punched, his face bruised, and his finger broken) by strangers who told him to stay away from the pro-democratic forces in the country"). Furthermore, neither the IJ, nor the BIA, has come forward with any case suggesting the contrary.[5]

---

[5] In support of his determination that Ms. Tchemkou did not suffer past persecution under this court's case law, the IJ relied

(continued...)

⁵  (...continued)
on three cases. In the first case, *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998), the petitioner was detained once for a two-week period during which he was forced to remain in a standing position; he also was deprived of sufficient food and water. On another occasion, he was detained and beaten with a stick; the beating resulted in the loss of two teeth. The BIA determined that these incidents did not rise to the level of persecution. This court remanded because it appeared that the BIA had required a showing that the petitioner must have suffered "serious injuries" before being eligible for asylum. In doing so, the court reiterated the proper standard for determining persecu- tion: "punishment or infliction of harm that rises above the level of mere harassment." *Id.* at 723 (internal quotation marks omitted). Although the initial detention in *Asani* was longer than that endured by Ms. Tchemkou, this court did not suggest in *Asani* (or in any subsequent cases) that the abuses suffered by Asani established the standard for determining whether an individual had endured past persecution. *Asani* is simply an example of a petitioner who met his burden.

The IJ also relied on *Vaduva v. INS*, 131 F.3d 689 (7th Cir. 1997). In *Vaduva*, the BIA had determined, and this court agreed, that the petitioner's experiences in Romania constituted past persecution and rendered the petitioner presumptively eligible for asylum. Specifically, the petitioner had been beaten twice, the more serious of which resulted in bruises and a broken finger. Nevertheless, the court determined that changed conditions in Romania since the incidents rebutted the presump- tion. We fail to see how *Vaduva* supports the IJ's conclusion that Ms. Tchemkou did not meet her burden. The abuses suffered by Ms. Tchemkou at least match those detailed by the petitioner in *Vaduva*.

Finally, in *Dandan v. Ashcroft*, 339 F.3d 567 (7th Cir. 2003), the BIA had determined that the petitioner had not suffered past

(continued...)

The Government acknowledges that Ms. Tchemkou suffered abuse, but argues that her experiences do not constitute persecution for several reasons, none of which we find persuasive. First, the Government maintains that these incidents "were wholly unrelated and do not support any pattern of abuse targeting Ms. Tchemkou specifically." Appellee's Br. at 20. The Government provides no support for the proposition that oppression needs to be in response to the same issue in order to be considered in the aggregate. Furthermore, the record does not support a conclusion that Ms. Tchemkou was not targeted for retaliation. Far from losing interest in Ms. Tchemkou's activities over time, the record reflects that Cameroonian police consistently responded aggressively to Ms. Tchemkou's activities over an eight year period. As well,

---

[5] (...continued)

persecution when, on one occasion, he was detained without food for three days and was beaten, causing his face to become swollen. This court held that the evidence did not compel a contrary finding: "While it is distasteful to have to quantify suffering for the purposes of determining asylum eligibility, that is our task. A standard of review that requires our being compelled to reach a conclusion contrary to the BIA means that we necessarily search for specifics, not generalities," *id.* at 574, and Dandan had not provided the necessary specifics to compel a result contrary to that reached by the BIA. However, the IJ noted that the presentation of evidence by the petitioner in *Dandan* differed materially from that of Ms. Tchemkou, who provided the specifics that the petitioner in *Dandan* had not, namely the way in which she was beaten, the injuries she had suffered, the abhorrent circumstances of her confinement and the length of her ensuing hospital stay.

the record establishes that, at least with respect to the 1998 incident, the police abducted and beat Ms. Tchemkou only after confirming that "you are the person we are looking for." A.R.110.

Equally unconvincing is the Government's contention that Ms. Tchemkou did not suffer any harassment different in kind from the general population of Cameroon. According to the Government, hers "were abuses of short duration that were commonly experienced by the people of Cameroon, a country that maintains a poor human rights record. The evidence in the record shows only the existence of general conditions of political conflict in Cameroon . . . ." Appellee's Br. at 21. Again, this assertion is belied by the record. On three different occasions, Ms. Tchemkou was singled out for abuse because of her political opposition to government action. She did not suffer the general deprivations and danger of individuals living in a war-ridden nation.

Finally, the Government argues that any abuse suffered by Ms. Tchemkou cannot be considered persecution because she was able to live without incident for several years at a time and was able to pursue her education. The record actually demonstrates the opposite. Ms. Tchemkou became politically active in 1993. Her initial efforts on behalf of striking teachers were met with violence, as was every other effort of hers to speak out against government oppression. The only time that Ms. Tchemkou did not experience difficulties was when she spent several years in exile in Benin and when she was confined to her parents' house. When she did reappear and express opinions in opposition to the government, she was severely punished.

The fact is that Ms. Tchemkou suffered two severe beatings (and other less severe ones) after voicing opposi-

tion to government policies. One of those beatings (followed by three days of incarceration) resulted in her being hospitalized for 14 days; another beating resulted in her being hospitalized for 24 days. Both of these incidents conclusively establish that Ms. Tchemkou has suffered persecution as a result of her political opinion. She, therefore, is entitled to a rebuttable presumption that she will suffer future persecution if returned to Cameroon, thus meeting the eligibility requirements for asylum.

**B.**

Ms. Tchemkou also challenges the BIA's and the IJ's conclusion that she has not demonstrated a well-founded fear of future persecution if she is returned to Cameroon. The burden is on Ms. Tchemkou to establish a "reasonable possibility of future persecution," *Kllokoqi v. Gonzales*, 439 F.3d 336, 345 (7th Cir. 2005), a burden that may be satisfied by showing "that there is even a 10 percent chance that [s]he will be shot, tortured, or otherwise persecuted," *id.* With respect to future persecution, Ms. Tchemkou must establish that she genuinely fears returning to Cameroon and that "a reasonable person in [her] circumstances would fear persecution if forced to return to [her] native country." *Id.*

Even absent the rebuttable presumption of future persecution to which Ms. Tchemkou is entitled, she has met this burden. Indeed, the evidence compels such a finding. Ms. Tchemkou, and her participation in opposition activities, are known to the authorities in Cameroon. The Cameroonian government has attempted to quell her activism over a number of years and has used brutal tactics to achieve this objective. The evidence in the record shows

that, even after her departure from the country, the government of Cameroon remained interested in Ms. Tchemkou; indeed, it issued summonses for her appearance after she had departed. A.R.335-36. Finally, Ms. Tchemkou's uncle submitted a letter in support of her asylum application explaining that many of the young people with whom Ms. Tchemkou previously had associated were no longer alive and that Ms. Tchemkou had reason to fear for her life as well. A.R.248. In short, all of the evidence in the record points to a reasonable possibility that Ms. Tchemkou would be subjected to persecution if she were returned to Cameroon.

The Government argues that Ms. Tchemkou's belief that she will suffer harm upon her return to Cameroon is speculative, and that the reasonableness of her belief is undermined by the fact that her family has lived in Cameroon without incident since her departure. The Government points to *Bhatt v. Reno*, 172 F.3d 978 (7th Cir. 1999), *Lwin v. INS*, 144 F.3d 505 (7th Cir. 1998), and *Toptchev v. INS*, 295 F.3d 714 (7th Cir. 2002), in support of this argument. However, none of these cases presented a situation similar to that of Ms. Tchemkou.

In *Bhatt*, the petitioner was claiming persecution on the basis of his religion—a trait he shared with other family members. Consequently, the fact that family members in his home country had not suffered harm was probative of what the petitioner's experience would be if returned to his home country.

Similarly, in *Lwin*, the petitioner claimed that he would suffer future persecution because the Burmese government would "impute" to him the political opinions of his eldest son. However, petitioner's wife and other sons had re-

mained in Burma without incident. Consequently, the petitioner's fears were merely speculative. *See Lwin*, 144 F.3d at 510.

Finally, in *Toptchev*, this court agreed that any presumption of future persecution was rebutted by the State Department report, which recounted Bulgaria's movement toward democracy since the petitioners' departure. This conclusion was bolstered by the fact that other family members, some of whom also had been active in speaking out against the former communist regime, had lived in Bulgaria undisturbed. *See Toptchev*, 295 F.3d at 722. Here, however, there is no evidence that Cameroon's human rights record has improved since Ms. Tchemkou's departure, nor is there any evidence that Ms. Tchemkou's parents or siblings were involved in the type of protests in which she had participated while in Cameroon. Consequently, the fact that her family members have lived in Cameroon without incident does not speak to how Ms. Tchemkou would be treated upon her return.

## C.

Ms. Tchemkou also challenges the IJ's and the BIA's conclusion that she is not entitled to relief under the CAT. 8 C.F.R. § 208.16(c)(2) sets forth the standard for obtaining relief under the CAT: "The burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." The regulations define torture as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punish-

ing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a); *see also Mabasa v. Gonzales*, 440 F.3d 902, 907 (7th Cir. 2006) (quoting regulation), *superseded on other grounds by Mabasa v. Gonzales*, 455 F.3d 740 (7th Cir. 2006). In making the determination whether an alien has met her burden, the regulations direct that the following factors "shall be considered": evidence of past torture; evidence that the applicant could relocate to a different part of her home country; evidence of "gross, flagrant or mass violations of human rights within the country of removal"; and other relevant country conditions. *See* 8 C.F.R. § 208.16(c)(3)(i)-(iv).

Here again we believe that the record compels a finding that Ms. Tchemkou is entitled to relief under the CAT. There is no question that her prior experiences in Cameroon constituted torture as defined by the regulations. Both Ms. Tchemkou's initial run-in with police, which included a beating and a detention under deplorable conditions, as well as her 1998 abduction and beating, only could be described as the intentional infliction of severe pain or suffering for the purposes of punishing Ms. Tchemkou's political activity and preventing such behavior in the future. Furthermore, other regulatory considerations strongly suggest that Ms. Tchemkou will suffer torture if returned to Cameroon: She has not been able to escape government retaliation regardless of her location in

Cameroon, and Cameroon admittedly continues to have a poor civil rights record. On this record, it is more likely than not that Ms. Tchemkou will be tortured if removed to Cameroon.

**Conclusion**

In sum, the record compels a conclusion that Ms. Tchemkou has suffered past persecution and will suffer future persecution if returned to Cameroon. Additionally, the record establishes that Ms. Tchemkou has endured torture and likely will endure additional torture if returned to Cameroon. We therefore grant the petition for review. We reverse the decision of the BIA and remand this case for additional proceedings consistent with this opinion.

PETITION GRANTED; REVERSED and REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*